[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 271.]

CLARK, ADMR., APPELLANT, ET AL., *v.* SCARPELLI ET AL.; MID-CENTURY
INSURANCE COMPANY, APPELLEE.

[Cite as *Clark v. Scarpelli*, 2001-Ohio-39.]

*Insurance—Motor vehicles—Mandatory offering of uninsured and underinsured
motorist coverage—"Amounts available for payment" language in R.C.
3937.18(A)(2), for the purpose of setoff, construed.*

(Nos. 00-206 and 00-374—Submitted November 29, 2000—Decided April 11,
2001.)

APPEAL from and CERTIFIED by the Court of Appeals for Montgomery County,
No. 17883.

————————————

SYLLABUS OF THE COURT

For the purpose of setoff, the "amounts available for payment" language in R.C.
3937.18(A)(2) means the amounts actually accessible to and recoverable by
an underinsured motorist claimant from all bodily injury liability bonds and
insurance policies (including from the tortfeasor's liability carrier).

————————————

DOUGLAS, J.

{¶ 1} On October 16, 1996, Shane T. Parker died as a result of injuries
sustained in a one-car collision in Montgomery County, Ohio. The automobile in
which Shane was an occupant was owned by his mother, appellant, Cheryl Clark.
At the time of the accident, appellant was insured through a policy of automobile
liability insurance issued by appellee, Mid-Century Insurance Company.
Appellant's policy with Mid-Century included an uninsured and underinsured
motorist coverage provision with limits of $100,000 for each person and $300,000
for each occurrence.

**{¶ 2}** On January 24, 1997, in the Court of Common Pleas of Montgomery County, appellant filed a cause of action individually and as administrator of her son's estate.[1] In the complaint, appellant sought wrongful death damages pursuant to R.C. Chapter 2125 on behalf of herself and other statutory wrongful death beneficiaries. The complaint also included a survival claim on behalf of Shane's estate and a declaratory judgment action against appellee seeking underinsured motorist benefits.

**{¶ 3}** On December 23, 1998, the trial court entered its decision granting in part and denying in part appellee's motion for summary judgment. The trial court found that reasonable minds could only conclude that James Scarpelli, the alleged tortfeasor, was the driver of the vehicle at the time of the accident. The tortfeasor's liability carrier subsequently settled with appellant for the $100,000 per person limit and appellant dismissed all claims against tortfeasor Scarpelli. Relevant to the matters before this court, the trial court held that appellant and the other wrongful death beneficiaries were not entitled to underinsured motorist benefits because a provision of the Mid-Century policy unambiguously reduced all claims arising out of the death of one person to the single, "each person" policy limit of $100,000. The trial court therefore held that since the each-person policy limit of the Mid-Century policy matched the per-person limit of the tortfeasor's automobile liability policy, underinsured motorist benefits were not available.

**{¶ 4}** Appellant appealed the trial court's judgment to the Montgomery County Court of Appeals. The court of appeals primarily focused on two specific issues raised by the parties. The first issue concerned the parties' conflicting interpretations of the setoff language in R.C. 3937.18(A)(2), specifically the meaning of the "amounts available for payment" language set forth in the statute. Before the court of appeals, appellant argued that the phrase "amounts available for

---

1. Shane's father, Richard Parker, was also named a plaintiff.

payment" means the amount "actually available" for payment from the tortfeasor. In contrast, appellee contended that the phrase requires a policy-limit-to-policy-limit comparison and if the tortfeasor's liability limits are the same as the underinsured motorist coverage limits, then no recovery is available. The second issue involved whether the language of the Mid-Century policy purporting to limit all wrongful death beneficiary claims to the single each-person limit is unambiguous and thus valid or ambiguous and thus invalid.

{¶ 5} In regard to the first issue, the court of appeals decided in favor of appellant and held, in effect, that if the actual amount available under the tortfeasor's liability policy to each insured is less than the Mid-Century underinsured motorist coverage limit, the insureds should recover the difference up to the total of the appropriate limit of coverage. The court of appeals noted that comparing the amount actually received from the tortfeasor with the limits of the insureds' underinsured motorist coverage, instead of a limits-to-limits comparison, is "the only interpretation of R.C. 3937.18(A)(2) which comports with statutory public policy."

{¶ 6} On the second question, the court of appeals considered whether each wrongful death beneficiary was entitled to recover for his or her individual claims under the separate, each-person limit of the Mid-Century policy up to the maximum $300,000 each-occurrence limit, or whether all claims were restricted to the $100,000 each person limit. An aggregate total of $100,000 had been received and distributed among the four wrongful death beneficiaries, each receiving less than the each-person underinsured motorist coverage limit. In resolving this issue, the court of appeals found that the language of the Mid-Century policy clearly and unambiguously restricted all wrongful death claims to the single each-person limit. Thus, the amount recovered from the tortfeasor's liability carrier, $100,000, was set off against the each-person limit of underinsured motorist coverage of the Mid-

Century policy, $100,000, thereby precluding Shane's wrongful death beneficiaries access to underinsured motorist benefits.

**{¶ 7}** Thereafter, appellant filed a motion requesting the court of appeals to certify its decision as in conflict with the Fifth District Court of Appeals' decision in *Farmers Ins. of Columbus, Inc. v. Atkinson* (Oct. 29, 1992), Stark App. No. CA-8931, unreported, 1992 WL 318886. The court of appeals agreed and entered an order certifying a conflict.

**{¶ 8}** This cause is now before this court upon our determination that a conflict exists (case No. 00-374) and upon the allowance of a discretionary appeal (case No. 00-206).

**{¶ 9}** On October 20, 1994, the General Assembly enacted Am.Sub.S.B. No. 20 ("S.B. 20"), which effectuated changes to R.C. 3937.18, that section of the Revised Code providing for the mandatory offering of uninsured and underinsured motorist coverage. 145 Ohio Laws, Part I, 204, 240. R.C. 3937.18(A)(2), as amended by S.B. 20, provided[2]:

"Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage and shall provide protection for an insured against loss for bodily injury, sickness, or disease, including death, suffered by any person insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the insured's uninsured motorist coverage. Underinsured motorist coverage is not and shall not be excess insurance to other applicable liability coverages, and shall be provided only to afford the insured an amount of protection not greater than that which would be available under the insured's uninsured

---

2. There have been two subsequent amendments to R.C. 3937.18(A)(2) since the enactment of S.B. 20. See 147 Ohio Laws, Part II, 2373; 2000 Sub.S.B. No. 267, effective September 21, 2000. However, those changes were relatively minor, and the language of R.C. 3937.18(A)(2) under consideration here has remained unchanged.

motorist coverage if the person or persons liable were uninsured at the time of the accident. The policy limits of the underinsured motorist coverage shall be reduced by those *amounts available for payment* under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." (Emphasis added.) 145 Ohio Laws, Part I, 210-211.

{¶ 10} The first issue that we must address involves the practical application of the setoff provision regarding underinsured motorist coverage in R.C. 3937.18(A)(2). This setoff provision was amended by S.B. 20 to provide that "[t]he policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." Our consideration of this matter will focus specifically on the "amounts available for payment" language of the statute.

{¶ 11} We begin, as we do in all cases involving statutory construction, by ascertaining the intent of the General Assembly in enacting a statute and giving effect to that intent. *Cochrel v. Robinson* (1925), 113 Ohio St. 526, 149 N.E. 871, paragraph four of the syllabus. "If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.* (1996), 74 Ohio St.3d 543, 545, 660 N.E.2d 463, 465. In order to determine the intent of the General Assembly in enacting legislation the court must give effect to the words used in the statute. *Bernardini v. Conneaut Area City School Dist. Bd. of Edn.* (1979), 58 Ohio St.2d 1, 4, 12 O.O.3d 1, 3, 387 N.E.2d 1222, 1224. However, where the words of the statute are ambiguous, a court is charged with construing the language in a manner that reflects the intent of the General Assembly. *Cochrel,* 113 Ohio St. 526, 149 N.E. 871, paragraph four of the syllabus.

{¶ 12} A statute is ambiguous when its language is subject to more than one reasonable interpretation. *State v. Jordan* (2000), 89 Ohio St.3d 488, 492, 733

N.E.2d 601, 605. Initially, we note that the phrase "amounts available for payment" is not defined in R.C. 3937.18. Since the enactment of S.B. 20 on October 20, 1994, much confusion has surrounded R.C. 3937.18. Predictably, and perhaps unavoidably, the General Assembly's promulgation of S.B. 20 has spawned an increasing amount of litigation involving uninsured and underinsured motorist coverage. The changes to R.C. 3937.18(A)(2) brought about by S.B. 20 have resulted in conflicting interpretations by various trial and appellate courts throughout Ohio, leading to a state of uncertainty among insurers and insureds concerning underinsured motorist coverage. Here, the statutory language at issue is susceptible of at least two conflicting interpretations. The arguments raised in this matter are a testament to the resultant confusion surrounding the statutory language. Thus, we must delve further into the intent of the General Assembly in enacting S.B. 20.

{¶ 13} Accordingly, we must now look beyond the words of the statute and construe R.C. 3937.18(A)(2), as amended by S.B. 20, in a manner that reflects the purpose of the General Assembly. *Cochrel*, 113 Ohio St. 526, 149 N.E. 871, paragraph four of the syllabus. We are guided by the rule that when a statute is ambiguous, the court, in determining the intent of the General Assembly, may consider the objective of the statute and the consequences of any particular construction. R.C. 1.49(A) and (E). Moreover, R.C. 3937.18 is remedial legislation. *Stanton v. Nationwide Mut. Ins. Co.* (1993), 68 Ohio St.3d 111, 113, 623 N.E.2d 1197, 1199. We, therefore, must construe the statute liberally to give effect to its legislative purpose. R.C. 1.11; *Curran v. State Auto. Mut. Ins. Co.* (1971), 25 Ohio St.2d 33, 38, 54 O.O.2d 166, 169, 266 N.E.2d 566, 569.

{¶ 14} In *James v. Michigan Mut. Ins. Co.* (1985), 18 Ohio St.3d 386, 18 OBR 440, 481 N.E.2d 272, disapproved on other grounds in *Cole v. Holland* (1996), 76 Ohio St.3d 220, 667 N.E.2d 353, the court discussed the motivation behind the General Assembly's adoption of mandatory underinsured motorist

coverage, which was found at that time in former R.C. 3937.181. See 138 Ohio Laws, Part I, 1459. "Underinsured motorist coverage was first required by statute after the legislature discovered the 'underinsurance loophole' in *uninsured* motorist coverage—*i.e.,* persons injured by tortfeasors having extremely low liability coverage were being denied the same coverage that was being afforded to persons who were injured by tortfeasors having *no* liability coverage. Thus, the original motivation behind the enactment of [former] R.C. 3937.181(C) was to assure that persons injured by an underinsured motorist would receive at least the same amount of total compensation that they would have received if they had been injured by an uninsured motorist." (Emphasis *sic*.) *James*, 18 Ohio St.3d at 389, 18 OBR at 443, 481 N.E.2d at 274-275. In discussing the issue of setoff, we held that "[a]n insurer may apply payments made by or on behalf of an underinsured motorist as a setoff directly against the limits of its underinsured motorist coverage, so long as such setoff (1) is clearly set forth in the terms of the underinsured motorist coverage and (2) *does not lead to a result wherein the insured receives a total amount of compensation that is less than the amount of compensation that he would have received if he had been injured by an uninsured motorist*." (Emphasis added.) *Id.* at paragraph two of the syllabus.

{¶ 15} We reiterated that position regarding underinsured and uninsured motorist coverage in *Cincinnati Ins. Co. v. Phillips* (1990), 52 Ohio St.3d 162, 165, 556 N.E.2d 1150, 1153, when we concluded that "it would make no sense for this court to reach the absurd result that an injured party is better off when struck by an uninsured tortfeasor than by a person who possesses liability insurance." Finally, in *Motorists Mut. Ins. Co. v. Andrews* (1992), 65 Ohio St.3d 362, 365, 604 N.E.2d 142, 145, construing former R.C. 3937.18(A)(2) in light of the General Assembly's purpose in enacting the statute, we emphasized that "the well-reasoned public policy behind requiring underinsured motorist coverage is to assure that an injured

person receive at least the same amount of compensation whether the tortfeasor is insured or uninsured."

{¶ 16} It is clear that underinsured motorist coverage, as described in R.C. 3937.18(A)(2) as amended by S.B. 20, was not intended to be "excess insurance" to the tortfeasor's applicable automobile liability insurance. The language of the statute is unmistakable. The language of R.C. 3937.18(A)(2) also makes clear that the statute was intended to ensure that a person injured by an underinsured motorist should never be afforded greater protection than that which would have been available had the tortfeasor been uninsured.

{¶ 17} As can be gleaned from the public policy behind the enactment of the underinsured motorist statute, as well as the statutory language, the purpose of underinsured (and uninsured) motorist coverage is to treat injured automobile liability policyholders the same whether a tortfeasor is underinsured or uninsured. It is apparent from the foregoing that the General Assembly intended that when a person carries automobile liability insurance and that person is injured in an accident by an uninsured or underinsured tortfeasor, the insured policyholder may be compensated up to the limits of his or her applicable uninsured/underinsured motorist coverage for any losses sustained.

{¶ 18} Based on this premise, we construe the "amounts available for payment" language in R.C. 3937.18(A)(2), as amended by S.B. 20, as requiring a comparison between the amounts that are actually accessible to the injured claimant from the tortfeasor's automobile liability insurance carrier and the injured claimant's own underinsured motorist coverage limits. The phrase "amounts available for payment" means just that. In other words, it means those amounts the insured actually recovers from a tortfeasor whose liability policy is subject to the claim of the insured and also to the claims of other injured persons. For the reasons stated throughout this opinion, we find that this construction is supported by the statutory language and prior decisions of this court regarding R.C. 3937.18(A)(2),

and, we believe, is the only interpretation that truly reflects the public policy behind the adoption of mandatory underinsured motorist coverage in this state.

{¶ 19} In 1992, this court decided the case of *Motorists Mut. Ins. Co. v. Andrews,* 65 Ohio St.3d 362, 604 N.E.2d 142. In *Andrews,* the court considered the application of underinsured motorist coverage in a situation similar to the case at bar, involving multiple claimants. In *Andrews,* the question before the court was "whether underinsured motorist coverage is available to an insured where the tortfeasor's policy limit is greater than the insured's policy limits but the claims of multiple claimants have resulted in undercompensation of the insured's injuries." *Id.* at 364, 604 N.E.2d at 144. We held in *Andrews* that "[w]hen determining whether a motorist is underinsured within the meaning of [former] R.C. 3937.18(A)(2), the *amount actually available for payment* under the tortfeasor's liability insurance policy must be compared with the insured's underinsured motorist coverage limits. If the amount available for payment is less than the insured's underinsured policy limits, then the insured is entitled to underinsured motorist coverage." (Emphasis added.) *Id.* at syllabus.

{¶ 20} In *Andrews* we rejected a comparison-of-the-limits approach where "the claims of multiple claimants result in reduction of the amount *available for payment* to the insured below the underinsured motorist limits." (Emphasis *sic*.) *Id.* at 365-366, 604 N.E.2d at 145. In so doing, the court determined that "the clear language of [former] R.C. 3937.18(A)(2) requires a comparison between the amount actually available for payment to an insured and the policy limits of the insured's underinsured motorist coverage. The operative language of [former] R.C. 3937.18(A)(2) states that '[u]nderinsured motorist coverage * * * shall provide protection * * * where the limits of coverage available for payment to the insured * * * are less than the limits for the insured's uninsured motorist coverage at the time of the accident. * * *' Reading this statute, in conjunction with the public policy behind its adoption, the inescapable conclusion is that, when determining

whether a motorist is underinsured, the *amount actually available for payment* under the tortfeasor's policy must be compared with the insured's underinsured motorist coverage limits. If the amount *available for payment* is less than the insured's underinsured policy limits, then the insured is entitled to underinsured motorist coverage. This is the only reading of R.C. 3937.18(A)(2) which can give full effect to the General Assembly's stated intent." (Emphasis *sic.*) *Id.* at 366-367, 604 N.E.2d at 145-146.

{¶ 21} The court, in applying the above rationale to the facts of *Andrews*, concluded that the Andrewses were entitled to underinsured motorist benefits. The court reached this result by first determining the *amount available for payment*, *i.e.,* the amount that was actually available, and could in fact be paid, to the Andrewses from the tortfeasor's automobile liability policy. The court then compared that amount, which was zero dollars after the exhaustion of the tortfeasor's liability limits by payments made to one injured claimant, to the underinsured motorist coverage limits of the Andrewses' policy. *Id.* at 364 and 367, 604 N.E.2d at 144 and 146.

{¶ 22} We realize that the court in *Andrews* did not focus its attention on the question of setoff and instead limited its analysis to certain, specific language in R.C. 3937.18(A)(2) that is not under consideration in this case. In addition, we recognize that our decision in *Andrews* preceded the enactment of S.B. 20 by approximately two years. Moreover, in deciding this matter, we are cognizant of the fact that S.B. 20 eliminated the phrase "amounts actually recovered" from R.C. 3937.18(A)(2) and substituted the phrase "amounts available for payment" when it amended R.C. 3937.18(A)(2). However, the court in *Andrews* did specifically consider the term "amount available for payment," a term virtually identical to that which we are called upon to interpret today.

{¶ 23} It is presumed that the General Assembly is fully aware of any prior judicial interpretation of an existing statute when enacting an amendment. *State ex*

10

*rel. Huron Cty. Bd. of Edn. v. Howard* (1957), 167 Ohio St. 93, 96, 4 O.O.2d 83, 84, 146 N.E.2d 604, 607. In enacting S.B. 20, the General Assembly chose to adopt the language "amounts available for payment," a phrase that is repeated throughout *Andrews* and interpreted in our decision to mean those amounts actually accessible to and recoverable by the claimant from the tortfeasor's liability policy. Thus, we conclude that the General Assembly was fully advised when the Senators and Representatives chose the language "amounts available for payment."

{¶ 24} Further, if we were to adopt a strict "policy-limits-to-policy-limits" comparison approach we would be creating the potential for the law to treat uninsured and underinsured motorist claimants differently. Had the General Assembly intended such a result there would be no need for the "amounts available for payment" language. The General Assembly could have simply chosen other language, such as "the policy limits of the underinsured motorist coverage shall be reduced by the policy limits under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." Of course such an approach would be inequitable and would defeat, rather than advance, the public policy reasons, set forth by the General Assembly in the statute itself, for adopting mandatory underinsured motorist coverage.

{¶ 25} The argument might be made that our resolution of *Andrews* was in error. Despite our holding in *Andrews,* some may contend that, through the plain language of R.C. 3937.18(A)(2), it was the intent of the General Assembly to provide that underinsured motorist coverage is never available where the limits of the tortfeasor's coverage are equal to or greater than the limits of the underinsured motorist coverage. An additional contention might be that *Andrews* is no longer good law in light of the S.B. 20 changes to R.C. 3937.18(A)(2). We have considered these arguments and reject them for the following reasons.

{¶ 26} Our decision in *Andrews* completely and properly resolves the issue in this matter. The court in *Andrews* noted that a limits-to-limits comparison

approach is proper only in situations where a single claimant is involved. *Id.*, 65 Ohio St.3d at 365-366, 604 N.E.2d at 145. Therein lies the distinction. The court, accordingly, determined that in situations where "the claims of multiple claimants result in reduction of the amount *available for payment* to the insured below the underinsured motorist limits," the insured is entitled to underinsured motorist coverage. *Id.* We noted that a strict policy-limits-to-policy-limits approach in situations involving multiple claimants would not give full effect to the public policy behind the General Assembly's enactment of the underinsured motorist statute. *Id.* at 366-367, 604 N.E.2d at 145-146.

{¶ 27} Furthermore, the enactment of S.B. 20 had no effect whatsoever on the validity of our holding in *Andrews*. We find it significant that nowhere in the S.B. 20 amendments to R.C. 3937.18(A)(2), either in the codified or uncodified sections, does the General Assembly indicate any intent, express or implied, to legislatively supersede our decision in *Andrews*. In fact, by adopting virtually the same language, "amounts available for payment," from our decision in *Andrews*, the presumption is that the General Assembly approved of our holding when it enacted the S.B. 20 changes to R.C. 3937.18(A)(2). Thus, *Andrews* is still good law and completely dispositive of the matters before us.

{¶ 28} Of course, and in any event, in construing statutory language, we must proceed under a presumption that, in enacting a statute, the General Assembly intended a "just and reasonable result." R.C. 1.47(C). However, that intention would be utterly destroyed should we adopt a strict "limits to limits" comparison approach. It would be manifestly absurd to interpret the S.B. 20 amendments to R.C. 3937.18(A)(2) as permitting an insurer to offset, against its own insured, those amounts that a tortfeasor's automobile liability insurance carrier has paid to *other* injured parties. In circumstances involving matching limits and multiple claimants, if an insurer were able to set off payments made to injured parties other than its own insureds, in many if not most instances, an insured would receive no

compensation from the tortfeasor and would also be unable to collect underinsured motorist benefits. We cannot and do not believe that that is what the General Assembly intended when it enacted R.C. 3937.18(A)(2).[3]

---

3. The emphasis of this section, and the fallacy of a *strict* "limits-to-limits" comparison approach, can perhaps be best demonstrated by the following two examples.

Suppose one person ("Craig") is injured in an automobile accident caused by an insured tortfeasor ("Bob"). Bob has automobile liability insurance with limits of $100,000 per person and $300,000 per accident. Craig has provable damages of $150,000. Craig recovers $100,000 from Bob's insurer. Craig has automobile liability insurance that includes a provision for uninsured/underinsured motorist coverage with limits of $100,000 per person and $300,000 per accident. Pursuant to R.C. 3937.18(A)(2), Craig's automobile liability carrier can "set off" the $100,000 that Craig received from Bob's automobile liability carrier. Thus, since the tortfeasor's (Bob's) limits and the injured claimant's (Craig's) limits are the same, Craig receives nothing from his underinsured motorist coverage even though his provable damages are $150,000. This outcome is consistent with the interpretation of the setoff provision and the "amounts available for payment" language of R.C. 3937.18(A)(2). That is, Craig's underinsured motorist coverage cannot be accessed as "excess insurance" and Craig is not any better or any worse off than if the tortfeasor had been *un*insured as opposed to *under*insured. In either instance, Craig would recover only $100,000 as compensation for his injuries.

Now suppose that, in addition to Craig, there are three other passengers traveling in Craig's automobile. All four occupants suffer injuries as a result of Bob's negligence and sustain provable damages in excess of $100,000 each. Each person in Craig's vehicle has separate automobile liability insurance policies that include uninsured/underinsured motorist coverage provisions of $100,000 per person and $300,000 per accident. Bob's insurer pays $300,000, the per-accident limit of liability, to Craig and his three passengers. Thus, assuming equal distribution, each person in Craig's vehicle receives $75,000.

Suppose that the setoff provision of R.C. 3937.18(A)(2) and the "amounts available for payment" language are interpreted using a strict policy-limits-to-policy-limits comparison approach. In that instance, each passenger's automobile liability insurer would be permitted to set off the $300,000 per-accident limit of the tortfeasor's policy against the policy limits of each passenger's uninsured/underinsured motorist coverage. Thus, since the tortfeasor's liability policy limits ($100,000/300,000) equals or exceeds the per-person limits ($100,000) of each individual's policy, neither Craig nor his three passengers would recover under the provisions of their underinsured motorist coverage. The net effect of permitting each person's insurer to set off the per-accident limit of the tortfeasor's policy is, in this instance, to credit each insurer with the same $300,000 obtained from the tortfeasor's insurer when, of course, only a total of $300,000 (not $1,200,000) was actually distributed to the injured claimants.

If, however, Craig and his passengers had been injured by an *un*insured motorist, each person would have a separate *un*insured motorist claim against his or her own insurer and would be able to collect *un*insured motorist benefits up to the $100,000 per person limit. Thus, comparing the two examples with the stated purpose and intent of R.C. 3937.18(A)(2), Craig and his passengers would certainly be in a better position financially speaking had they been injured by an *un*insured tortfeasor.

Conversely, by interpreting the "amounts available for payment" language in R.C. 3937.18(A)(2) to mean those amounts that each claimant can actually access or recover from the tortfeasor's automobile liability carrier, the result is the same whether Craig and his passengers are

**{¶ 29}** Accordingly, we hold that for the purpose of setoff, the "amounts available for payment" language in R.C. 3937.18(A)(2) means the amounts actually accessible to and recoverable by an underinsured motorist claimant from all bodily injury liability bonds and insurance policies (including from the tortfeasor's liability carrier). We, therefore, affirm the well-reasoned judgment of the court of appeals on this issue.

**{¶ 30}** A final issue remains for our consideration: the court of appeals' certification, and our determination, of the existence of a conflict between two appellate districts. We now proceed to answer the certified question.

**{¶ 31}** The question that has been certified for our consideration is:

"Does the [policy language quoted below] unambiguously limit [uninsured motorist/underinsured motorist] coverage to a single per-person limit for all wrongful death claims derived from one deceased insured?"

**{¶ 32}** The insurance policy at issue provides the following with regard to underinsured motorist coverage:

"The limits of liability shown in the Declarations apply subject to the following:

"1. The limit for 'each person' is the maximum for bodily injury sustained by any person in any one accident. Any claim for loss of consortium or injury to the relationship arising from this injury shall be included in this limit.

"2. Subject to the limit for 'each person,' the limit for 'each accident' is the maximum for bodily injury sustained by two or more persons in any one accident.

---

injured by an *un*insured tortfeasor or by an *under*insured tortfeasor. Accordingly, where the "amounts available for payment" from the tortfeasor to each occupant is $75,000, each person in Craig's vehicle could access up to an additional $25,000 in underinsured motorist benefits from his or her automobile liability carrier with no one person being able to recover more than his or her $100,000 per-person policy limit. Under this interpretation, the result is the same whether Craig and his passengers are injured by an uninsured tortfeasor or by an underinsured tortfeasor – the result mandated by the General Assembly when it expressed, in the statute, the purpose for enacting the mandatory offering of *under*insured motorist coverage.

"3. Subject to the law of the state of the occurrence, we will pay no more than these maximums regardless of the number of vehicles insured, insured persons, claims, claimants, policies, or vehicles involved in the accident." (Boldface omitted.)

{¶ 33} Mid-Century concedes that appellant and the other statutory wrongful death beneficiaries of decedent Shane Parker are all insureds pursuant to the Mid-Century policy. Mid-Century also acknowledges, in its brief before this court (although appellee's attorney at oral argument seemed to assume a different posture), that pursuant to applicable law each wrongful death beneficiary has a separate, individual claim for uninsured/underinsured motorist coverage.

{¶ 34} Pursuant to R.C. 2125.01 and 2125.02(A)(1), in an action for wrongful death, the surviving statutory beneficiaries have the right to recover damages suffered by reason of the wrongful death of the decedent. See *Wood v. Shepard* (1988), 38 Ohio St.3d 86, 89, 526 N.E.2d 1089, 1092, and *Sexton v. State Farm Mut. Auto. Ins. Co.* (1982), 69 Ohio St.2d 431, 23 O.O.3d 385, 433 N.E.2d 555. Further, each statutory wrongful death beneficiary's claim is considered separate and distinct from the claim of the estate, and from each other, pursuant to R.C. 2125.02(A)(1). *Wood v. Shepard* at 90, 526 N.E.2d at 1092.

{¶ 35} R.C. 3937.18(H) provides:

"Any automobile liability or motor vehicle liability policy of insurance that includes coverages offered under division (A) of this section or selected in accordance with division (C) of this section and that provides a limit of coverage for payment for damages for bodily injury, including death, sustained by any one person in any one automobile accident, may, notwithstanding Chapter 2125. of the Revised Code, include terms and conditions to the effect that all claims resulting from or arising out of any one person's bodily injury, including death, shall collectively be subject to the limit of the policy applicable to bodily injury, including death, sustained by one person, and, for the purpose of such policy limit

shall constitute a single claim. Any such policy limit shall be enforceable regardless of the number of insureds, claims made, vehicles or premiums shown in the declarations or policy, or vehicles involved in the accident."

{¶ 36} As set forth above, R.C. 3937.18(H) permits automobile liability insurers to include provisions in their insurance policies that consolidate all individual wrongful death claims arising out of any one person's bodily injury into a single claim and thereby limit all wrongful death damages to a single per-person policy limit. This consolidation must affirmatively appear in the policy, *i.e.*, insurers must include language within their policies of insurance that clearly and unambiguously consolidates such claims in order to give effect to such a limit. *United States Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.* (1997), 80 Ohio St.3d 584, 586, 687 N.E.2d 717, 719. In addition, it is well settled that "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus.

{¶ 37} Appellant contends in regard to the certified question that ambiguity exists in at least two respects. First, appellant urges us to find that the terms "loss of consortium" and "injury to the relationship" as used in the Mid-Century policy are ambiguous. Second, appellant contends that the Mid-Century policy language does not unambiguously consolidate *all damages* arising out of one person's death to a single per-person limit but, instead, consolidates only loss-of-consortium claims and injury-to-the-relationship claims into a single claim.

{¶ 38} In attempting to limit wrongful death damages, insurers are not required to use the exact wording set forth in R.C. 3937.18(H) or any other specific language. R.C. 3937.18(H) provides that automobile liability insurance policies "may * * * include terms and conditions *to the effect* that all claims resulting from or arising out of any one person's bodily injury, including death, shall collectively

16

be subject to the limit of the policy applicable to bodily injury, including death, sustained by one person, and, for the purpose of such policy limit shall constitute a single claim." (Emphasis added.)

{¶ 39} The Mid-Century policy provides in "Part II—Uninsured Motorist, Coverage C,"[4] that the insurer "will pay all sums which an insured person is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured person." (Boldface omitted.) "Bodily injury" is defined in the Mid-Century policy as "bodily injury to or sickness, disease or death of any person." According to the Mid-Century policy's uninsured/underinsured motorist provision, an "[i]nsured person" means "[a]ny person for damages that person is entitled to recover because of bodily injury to you, a family member, or another occupant of your insured car." (Boldface omitted.)

{¶ 40} As set forth in these sections of the Mid-Century policy, appellee has selected specific language that clearly allows for recovery of uninsured and underinsured motorist benefits for qualifying statutory wrongful death beneficiaries. The Mid-Century policy language provides that appellee "will pay all sums which an insured person is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle *because of* bodily injury sustained by the insured person." (Emphasis added and boldface omitted.) Further, "insured person" is defined as "any person for damages that person is entitled to recover *because of* bodily injury to you, a family member, or another occupant of your insured car." (Emphasis added and boldface omitted.)

{¶ 41} The question, however, remains whether the Mid-Century policy clearly and unambiguously limited all losses that resulted from the death of Shane

---

4. This provision of the Mid-Century policy includes *under*insured motorist coverage.

Parker to a single per-person policy limit. The "Limits of Liability" section of the uninsured/underinsured motorist provision of the policy provides:

"The limits of liability shown in the Declarations apply subject to the following:

"1. The limit for 'each person' is the maximum for bodily injury sustained by any person in any one accident. Any claim for loss of consortium or injury to the relationship arising from this injury shall be included in this limit."

{¶ 42} We do not agree with appellant that the phrases "loss of consortium" and "injury to the relationship" are ambiguous. The term "consortium" has long been part of English and American jurisprudence. Moreover, in *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052, at paragraphs one and two of the syllabus, we interpreted "consortium" to include services, society, companionship, comfort, love, solace, affection, guidance, and counsel. Thus, we reject appellant's contention that this term is "so broad as to be meaningless."

{¶ 43} Furthermore, while we agree with appellant that a "loss of consortium" action is different from a wrongful death action, we find that the phrase "injury to the relationship" is a clear reference to claims for wrongful death as contemplated by the Mid-Century policy. In reaching its resolution on this issue, the Montgomery County Court of Appeals noted that "an action for wrongful death arises out of the relationship between the decedent and his or her relatives [and thus] it is an injury to the relationship as defined by the policy."

{¶ 44} In an action for wrongful death pursuant to R.C. 2125.01, the surviving spouse, children, and parents of the decedent are all rebuttably presumed to have suffered damages by reason of the wrongful death. R.C. 2125.02(A)(1). The right of the statutory wrongful death beneficiaries to recover damages arises as a result of the suffering incurred by reason of the wrongful death of the decedent. *Wood v. Shepard*, 38 Ohio St.3d at 89, 526 N.E.2d at 1092. While the action itself

18

arises out of the death of the decedent, the action is brought for the "exclusive benefit" of decedent's next of kin. R.C. 2125.02(A)(1). In that regard, the wrongful death itself and the relationship between the decedent and his next of kin are inextricably intertwined. It is axiomatic that there would be no cause of action for wrongful death without both a wrongful death and the existence of at least one living statutory beneficiary of the decedent. Thus, we agree with the court of appeals that the language "loss of consortium or injury to the relationship" encompasses all derivative claims, including claims for wrongful death.

**{¶ 45}** The remainder of paragraph one of the "Limits of Liability" section is also clear. In construing this remaining policy language, we find that the Mid-Century policy does clearly and unambiguously restrict all wrongful death claims to a single per-person policy limit. This section provides that the "each person" limit of $100,000, as shown on the declarations page of the policy, is the maximum amount available for bodily injury sustained by any person in any one accident. Only one person, Shane Parker, sustained bodily injury. The "bodily injury" sustained by Parker was his death. Bodily injury is defined in the Mid-Century policy as including death. Because we have concluded that the phrase "injury to the relationship" encompasses wrongful death claims, any claim arising from the wrongful death of Shane Parker is included in the single each-person policy limit.

**{¶ 46}** Therefore, we hold that the language of the Mid-Century policy restricting all wrongful death claims to the single each-person policy limit is clear and unambiguous.

**{¶ 47}** Accordingly, the judgment of the court of appeals is affirmed in all respects.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶ 48} I agree with that part of the majority opinion that addresses whether the wrongful death claims can be limited to a single per-person limit. But because the majority also reaches and resolves an issue that is not before this court, I respectfully dissent from the syllabus and that part of the opinion regarding R.C. 3937.18(A)(2).

I

{¶ 49} The majority devotes several pages to interpreting the "amounts available for payment" language in R.C. 3937.18(A)(2). In fact, the majority goes so far as to "affirm" the court of appeals on this issue and carry its interpretation over to the syllabus. The syllabus and analysis of R.C. 3937.18(A)(2), however, are gratuitous because the issue is not even before this court. Neither party appealed the portion of the court of appeals' opinion that interpreted the "amounts available for payment" language. Although Clark mentioned the issue in her brief to this court, we did not accept jurisdiction over this issue. Accordingly, the only issue actually raised here is whether Mid-Century's policy properly limited wrongful death claims to a single per-person limit. By "deciding" the R.C. 3937.18(A)(2) question, the majority reaches out to address an issue not directly presented by this case. See *Gibson v. Meadow Gold Dairy* (2000), 88 Ohio St.3d 201, 203-204, 724 N.E.2d 787, 789 (choosing not to render an "advisory opinion" on an issue not directly presented). The result is syllabus law crafted from nothing more than dicta.

II

{¶ 50} Even if the "amounts available for payment" language in R.C. 3937.18(A)(2) were before the court in this cause, I would nevertheless dissent because I view the majority decision as misconstruing the validity of *Motorists Mut. Ins. Co. v. Andrews* (1992), 65 Ohio St.3d 362, 604 N.E.2d 142, misappropriating authority reserved to the General Assembly, and misapplying the statute's

"triggering" provision. Following an overview of pre-1994 R.C. 3937.18(A)(2), I shall discuss each point in turn.

### A. R.C. 3937.18(A)(2) Pre-S.B. 20

{¶ 51} The version of R.C. 3937.18(A)(2) in effect prior to the passage of Am.Sub.S.B. No. 20 ("S.B. 20") served three functions:

{¶ 52} First, the subsection's opening sentence set the minimum amount of underinsured motorist coverage ("UIM coverage") to be offered by an insurer: "Underinsured motorist coverage * * * shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage * * *." 142 Ohio Laws, Part I, 1739.

{¶ 53} Second, the subsection's first sentence also established that UIM coverage was triggered for the insured only "where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the insured's uninsured motorist coverage at the time of the accident." This triggering language explicitly mandates a limits-to-limits comparison. *Id*. at 1739-1740.

{¶ 54} Third, the subsection's second sentence explained how the limits of an insured's recovery were to be calculated: "The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts actually recovered under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." *Id*. at 1740.

{¶ 55} This court interpreted the triggering language in *Hill v. Allstate Ins. Co.* (1990), 50 Ohio St.3d 243, 553 N.E.2d 658. We held that "[u]nless otherwise provided by an insurer, underinsured motorist liability insurance coverage is not available to an insured where the limits of liability contained in the insured's policy are identical to the limits of liability set forth in the tortfeasor's liability insurance coverage." *Id*., syllabus.

**{¶ 56}** Nearly three years later, the court revisited the triggering provision of former R.C. 3937.18(A)(2) in *Andrews*, 65 Ohio St.3d 362, 604 N.E.2d 142. Specifically, the court addressed "whether underinsured motorist coverage is available to an insured where the tortfeasor's policy limit is greater than the insured's policy limits but the claims of *multiple* claimants have resulted in undercompensation of the insured's injuries." (Emphasis added.) *Id*. at 364, 604 N.E.2d at 144. In finding that such circumstances triggered underinsured motorist coverage, the court construed the phrase "the limits of coverage available for payment" in the first sentence of subsection (A)(2) to mean "the *amount actually available for payment*" under the tortfeasor's policy. (Emphasis added.) *Id*. at 366, 604 N.E.2d at 145-146.

**{¶ 57}** The court again considered former R.C. 3937.18(A)(2) in *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809. There, we addressed whether multiple parties could recover UIM benefits when the limits of the UIM policy involved are identical to the limits of the tortfeasor's liability policy. *Id*. at 508, 620 N.E.2d at 815. *Savoie* explicitly overruled *Hill*'s limits-to-limits comparison and held that "[a]n underinsurance claim must be paid when the individual covered by an uninsured/underinsured policy suffers damages that exceed those monies available to be paid by the tortfeasor's liability carriers." *Id.,* paragraph three of the syllabus. With this holding, the *Savoie* court implicitly construed "the limits of coverage available for payment" to mean "the amounts which the tortfeasor's insurer has already paid." *Id*. at 508, 620 N.E.2d at 815. Notably, while the language of the *Savoie* construction varies slightly from the construction set forth in *Andrews*, the result of the *Savoie* holding is the same as the holding in *Andrews*. Neither case's interpretation of the R.C. 3937.18(A)(2) triggering provision, however, is consistent with the intent of the General Assembly.

B. Legislative Intent and the R.C. 3937.18(A)(2) Triggering Provision

22

{¶ 58} By reaching the setoff issue, the majority implicitly accepts that UIM coverage has first been triggered. But the majority ignores that the legislature expressly stated that it intended to supersede the interpretation of the triggering provision espoused in *Andrews* and *Savoie*. In so doing, the General Assembly intended to provide for a limits-to-limits comparison in the triggering provision. And once a limits-to-limits comparison is done in this case, UIM coverage is not triggered, and the setoff question is not even reached.

{¶ 59} The majority of this court continues to indulge its preferred public policy. It evaluates the practical consequences of construing R.C. 3937.19(A)(2) as a limits-to-limits comparison and, finding the consequence of such a construction unpalatable, repeatedly concludes that this simply cannot be what the legislature intended.

{¶ 60} I find that the plain language of the triggering provision mandates a limits-to-limits comparison. But even assuming *arguendo* that the statute is ambiguous, the court may consider, in addition to other matters, not just the object of the statute and the consequences of a particular construction, but also "[t]he circumstances under which the statute was enacted," "the legislative history," and "[t]he common law or former statutory provisions, including laws upon the same or similar subjects." R.C. 1.49(B), (C), and (D). It is axiomatic that "[a]mbiguity in a statute should be resolved by examining the legislative intent of the statute." *Delli Bovi v. Pacific Indemn. Co.* (1999), 85 Ohio St.3d 343, 345, 708 N.E.2d 693, 694.

{¶ 61} The majority relies heavily upon the purported absence of a legislative explanation for the altered language of the setoff provision, stating that "[w]e find it significant that nowhere in the S.B. 20 amendments to R.C. 3937.18(A)(2), either in the codified or uncodified sections, does the General Assembly indicate any intent, expressed or implied, to legislatively supersede our decision in *Andrews*." The majority would thus presume that *Andrews'*s

interpretation of the triggering provision remains valid. But the uncodified law states:

"It is the intent of the General Assembly in amending division (A)(2) of section 3937.18 of the Revised Code to supersede the effect of the holding of the Ohio Supreme Court in the October 1, 1993 decision in *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, [620 N.E.2d 809], relative to the application of underinsured motorist coverage in those situations involving accidents where the tortfeasor's bodily injury liability limits are greater than or equal to the limits of the underinsured motorist coverage." Section 7, S.B. 20, 145 Ohio Laws, Part I, 238.

{¶ 62} Given such an explicit expression of legislative intent, I cannot agree that the General Assembly intended to adhere to the *Andrews-Savoie* construction of the triggering provision of R.C. 3937.18(A)(2). Because *Savoie* and *Andrews* contain the same erroneous interpretation of the statute, superseding *Savoie* has the practical effect of superseding *Andrews*. The "triggering" sentence of R.C. 3937.18(A)(2) should therefore not be interpreted pursuant to the *Andrews-Savoie* "amount recovered to limits of UIM coverage" comparison. Rather, the uncodified law should be viewed as evincing an intent to correct this court's prior, erroneous interpretation of the triggering provision set forth in *Andrews* and *Savoie* and to reinforce the limits-to-limits comparison that the plain language of the statute warrants.

{¶ 63} I note that the effect of the statutory scheme is not to vitiate the actual existence of UIM coverage as some may claim. Rather, the insured has purchased coverage that, as with much insurance, is subject to context-specific determinations of applicability. While the policy may not provide accessible coverage in regard to a specific claim, depending upon a limits-to-limits comparison, the policy may at the same time remain fully accessible in another claim. The insured chooses the amount of coverage he desires and is free to contract for greater levels of coverage that would increase the likelihood of applicability.

### C.  The Public Policy Behind R.C. 3937.18(A)(2)

{¶ 64} Instead of acknowledging the uncodified law, the majority continues to rely upon "the public policy behind the enactment of the underinsured motorist statute, as well as the statutory language" to conclude that "the purpose of underinsured (and uninsured) motorist coverage is to treat injured automobile liability policyholders the same whether a tortfeasor is underinsured or uninsured." I disagree for two reasons.

{¶ 65} First, the express words chosen by the General Assembly in the enacted statute and in the uncodified law evince a public policy contrary to that policy espoused by the majority.  The second sentence of R.C. 3937.18(A)(2) as amended by S.B. 20 states, as the majority recognizes, that underinsured motorist coverage is not excess insurance to other applicable coverages.  That sentence provides that "[u]nderinsured motorist coverage * * * shall be provided only to afford the insured an amount of protection *not greater than* that which would be available under the insured's uninsured motorist coverage if the person or persons liable were uninsured at the time of the accident."  (Emphasis added.)  145 Ohio Laws, Part I, 210-211.  While this declaration of purpose does not *preclude* equal recovery, neither does it *guarantee* equal recovery.  Rather, the sentence operates only as a *limitation* on the amount of recovery through UIM coverage.  Because a statute is to be read in its entirety, the first sentence of R.C. 3937.18(A)(2) as described in the foregoing discussion demonstrates the intent to permit potentially different results under UM versus UIM coverage.  Even if this provision is construed as ambiguous, the previously addressed, probative, uncodified law found in S.B. 20 reveals the legislative intent to overrule expressly the *Andrews-Savoie* rationale and to preserve the limits-to-limits comparison in the triggering provision, however inequitable a result it may at times produce.  See Section 7, S.B. 20, 145 Ohio Laws, Part I, 238.

**{¶ 66}** Second, this court's past articulation of the presumed public policy underlying the statutory scheme lacks support. In *James v. Michigan Mut. Ins. Co.* (1985), 18 Ohio St.3d 386, 389, 18 OBR 440, 443, 481 N.E.2d 272, 274, the court stated:

"Underinsured motorist coverage was first required by statute after the legislature discovered the 'underinsurance loophole' in *uninsured* motorist coverage—*i.e.*, persons injured by tortfeasors having extremely low liability coverage were being denied the same coverage that was being afforded to persons who were injured by tortfeasors having *no* liability coverage. Thus, the original motivation behind the enactment of [former] R.C. 3937.181(C) was to assure that persons injured by an underinsured motorist would receive at least the same amount of total compensation that they would have received if they had been injured by an uninsured motorist." (Emphasis *sic*.)

**{¶ 67}** The articulation of public policy set forth in *James* should not be, and cannot be, regarded as authoritative. This is so because there is no authority supporting *James*'s declaration of public policy, as a review of the legislative history of R.C. 3937.18 and 3937.181 reveals.

**{¶ 68}** The passage of Am.Sub.H.B. No. 22 in 1979 amended former R.C. 3937.18 and enacted former R.C. 3937.181. 138 Ohio Laws, Part I, 1459. The amendments to former R.C. 3937.18 related to UM coverage and are not germane here. Rather, the present inquiry is concerned with the enactment of former R.C. 3937.181.

**{¶ 69}** Former R.C. 3937.181(A) defined underinsured motorist coverage and explained its application:

"As used in this section, 'underinsured motorist coverage' means coverage in an automobile or motor vehicle liability policy protecting an insured against loss for bodily injury, sickness, or disease, including death, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and

26

insurance policies covering persons liable to the insured are insufficient to pay the loss up to the insured's uninsured motorist coverage limits." 138 Ohio Laws, Part I, 1459.

{¶ 70} This provision did not guarantee UIM recovery equal to the amount recoverable under UM coverage. Rather, much like the second sentence of current R.C. 3937.18(A)(2), former R.C. 3937.181(A) expressly limited UIM recovery to *no more than* the amount recoverable under UM coverage. This cannot be said to have created the guarantee of equal recovery that *James* and its progeny proclaimed as the public policy behind the statutory scheme.

{¶ 71} Nor does former R.C. 3937.181(C) support such public policy. Yet, the *James* majority stated that the claimed public policy motivated the enactment of that specific section. *James*, 18 Ohio St.3d at 389, 18 OBR at 443, 481 N.E.2d at 274-275. It was only in later decisions that the court stated that this "public policy" underlies the entirety of the statutory scheme. Neither construction was correct, as former R.C. 3937.181(C) provided:

"The benefits provided under underinsured motorist coverages shall be subject to the same provisions as to denial of coverage, insolvency, subrogation, or off-set as provided in uninsured motorist coverage under divisions (B), (C), and (D) of section 3937.18 of the Revised Code." 138 Ohio Laws, Part I, 1460.

{¶ 72} Former R.C. 3937.181(C) simply made various sections of the uninsured motorist statute applicable to underinsured coverage. Former R.C. 3837.18(B), for example, defined when a motor vehicle was to be classified as uninsured. Section (C) of that statute permitted a right of subrogation and offset, qualified by insolvency proceedings and "subject to the terms and conditions of [uninsured] coverage." *Id*. at 1459. Finally, section (D) precluded offset of workers' compensation recovery. *Id*. None of these sections articulated a public policy guaranteeing equal recovery regardless of whether a tortfeasor was underinsured or uninsured. Nor did they create a scheme whereby that would

always be the end result. Instead, these statutory provisions simply placed qualifications and protections upon UIM recovery, once such recovery could be had under the statutory scheme. Therefore, there is simply no statutory support for the purported "public policy" animating *James*.

{¶ 73} Nonetheless, this court cited *James*'s articulation of the purported public policy underlying former R.C. 3937.181 as supporting the result reached in *Hill,* 50 Ohio St.3d at 246, 553 N.E.2d at 661. Such reliance was misplaced. In *Hill*, the court addressed a situation in which the injured insured happened to receive the same amount of recovery from UIM coverage that he would have received under UM coverage, not because of the purported public policy, but because he was a single claimant who had purchased the same UIM and UM coverage limits. Cf. *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 63, 676 N.E.2d 506, 508-509 (explaining that because "[i]nsureds purchase their levels of protection," an insured who purchases equal UM/UIM coverage and who is the only claimant "is guaranteed total recovery for an accident up to those policy limits, regardless of the tortfeasor's insurance status"). The *Hill* court's reference to *James*'s public policy was not dispositive, then, but merely mischaracterized the natural result of *Hill* as an outgrowth of public policy.

{¶ 74} *James*'s "public policy" soon became an enabling mantra, relied upon to ignore the actual language of the triggering provision of R.C. 3937.18(A)(2). See, *e.g.*, *Savoie*, 67 Ohio St.3d at 508, 620 N.E.2d at 815; *Andrews*, 65 Ohio St.3d at 364-365, 604 N.E.2d at 144-145 (both citing *James*). To accept *James*'s declaration of public policy is to accept judicial fiat as capturing the supposed will of the people. The *expressed* will of the people as set forth in the statutory language and uncodified law, however, rejects the majority's claimed public policy.

{¶ 75} With its analysis here, the majority uses this "public policy" to reject the legislature's decision and again decides what the UM/UIM insurance law of

this state *should* be. But the role of a court is not to decide what the law *should* say; rather, the role of this court is to interpret what the law says *as it has been written by the General Assembly*—regardless of whether it constitutes sound policy. *Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 544, 639 N.E.2d 1154, 1156 ("A court's role is to interpret, not legislate").

D. UIM Coverage is not Triggered in This Case

{¶ 76} Following this court's decisions in *Andrews* and *Savoie*, the General Assembly amended the setoff provision of R.C. 3937.18(A)(2) in 1994 with the passage of S.B. 20. Both the S.B. 20 version and current R.C. 3937.18(A)(2)[5] provide:

"The policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." 145 Ohio Laws, Part I, 211.

{¶ 77} In considering this amended language—specifically the change from "amounts actually recovered" to "amounts available for payment"—the majority concludes that the legislature intended to adhere to this court's pre-S.B. 20 interpretation in *Andrews* of what "amounts available for payment" means. Such reasoning espouses the view that the 1994 amendment to the statute was merely cosmetic, then, as it would have effected no substantive change.

{¶ 78} Not only does this case fail to present this issue to this court, but this case also *could not* properly present the setoff issue, because UIM coverage is not even triggered under the policies involved here. As the majority concedes, *Andrews* interpreted the triggering provision of (A)(2) and not the setoff provision. While *Andrews* construed "the limits of coverage available for payment" in the triggering

---

5. The General Assembly amended other sections of R.C. 3937.18 in 1997 (147 Ohio Laws, Part II, 2372), 1999 (S.B. No. 57), and 2000 (Sub.S.B. No. 267). These amendments did not alter those provisions of R.C. 3937.18(A)(2) discussed herein.

provision of subsection (A)(2) to mean "the *amount actually available for payment*"—essentially the same as "those amounts actually recovered" in the language of the former setoff sentence of the subsection—this interpretation was erroneous both then and now. *Andrews*, 65 Ohio St.3d at 366, 604 N.E.2d at 145-146. The *Andrews-Savoie* rationale has not only been superseded; moreover, it was predicated on an unsupported perception of public policy and was contrary to the plain language of R.C. 3937.18(A)(2).

{¶ 79} That statute's plain language both provided and provides for a limits-to-limits comparison in the triggering provision. In this case, the tortfeasor's liability coverage was in the amount of $100,000 per person. Clark's UIM policy also had a $100,000 per-person limit. Therefore, under the limits-to-limits comparison mandated by the first sentence of R.C. 3937.18(A)(2), Clark's UIM coverage is not triggered. The statute's setoff provision is therefore irrelevant.

### III

**{¶ 80}** For the foregoing reasons, I decline to reach an issue not presented by this case and then elevate resulting dicta to the level of syllabus law. Further, were the issue presented, I would hold (1) that the intent of the General Assembly in S.B. 20 was to make clear that a limits-to-limits comparison is used in determining whether UIM coverage applies, and (2) that because the limits of the tortfeasor's coverage are the same as the UIM coverage in this case, the issue of setoff is never reached.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing opinion.

---

*Lamkin, Van Eman, Trimble, Beals & Rourke* and *Thomas W. Trimble; Crew, Buchanan & Lowe* and *Jeffrey A. Swillinger*, for appellant.

*Smith, Rolfes & Skavdahl Co.*, *L.P.A.*, *Matthew J. Smith* and *James P. Nolan II*, for appellee.

*Elk & Elk Co., L.P.A.*, and *Todd O. Rosenberg*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

---