OPINION
{¶ 1} Cecilia E. Wright ("Mrs. Wright"), individually and as executrix of the estate of Dr. James O. Wright, Jr. ("Dr. Wright"), and James Walter Wright ("James") appeal from a judgment of the Montgomery County Court of Common Pleas, which denied their motion for summary judgment and granted summary judgment in favor of The Cincinnati Insurance Company ("Cincinnati").
 {¶ 2} On July 2, 1999, Mrs. Wright, Dr. Wright, and their son James, who was three years old at the time, were passengers in an automobile owned and driven by Dr. Wright's father, James O. Wright, Sr. Also a passenger in the car was Essie D. Wright, who was Dr. Wright's mother and James O. Wright, Sr.'s wife. While traveling southbound on I-71 in Kentucky, James O. Wright, Sr. negligently lost control of the vehicle and struck a concrete culvert on the side of the highway. He, his wife Essie, and their son, Dr. Wright, were killed in the accident. Mrs. Wright and James were seriously injured.
 {¶ 3} At the time of the accident, Mrs. Wright was employed by Miami Valley Hospital, which was insured pursuant to an insurance policy issued by Cincinnati. The policy provided business automobile liability coverage, including uninsured/underinsured motorist coverage, with a limit of $1 million.
 {¶ 4} On June 29, 2001, Mrs. Wright, individually, as executrix of her husband's estate, and on behalf of her minor son James, filed a complaint against Cincinnati seeking coverage pursuant to Scott-Pontzerv. Liberty Mut. Fire Ins. Co., 85 Ohio St.3d 660, 1999-Ohio-292,710 N.E.2d 1116. Mrs. Wright has also filed two suits against other insurance companies seeking coverage under various policies that will be described below.
 {¶ 5} In addition to the Cincinnati policy, multiple insurance policies potentially provide coverage for the losses sustained in the July 2, 1999 accident. They include:
 {¶ 6} 1. A motor vehicle liability insurance policy issued to James O. Wright, Sr. by State Farm Mutual Automobile Insurance Company, which provides coverage for bodily injury with limits of $50,000 per person and $100,000 per accident. $50,000 has been paid to the estate of Dr. Wright under this policy, and the policy limits have been exhausted by a second payment of $50,000 to an injured passenger unrelated to this lawsuit.
 {¶ 7} 2. Three motor vehicle liability policies issued by State Farm Mutual Automobile Insurance Company, providing uninsured/underinsured motorist coverage, each with a limit of $100,000 per person and $300,000 per accident. Mrs. Wright is the named insured on one of these policies, and Dr. Wright is the named insured on the other two policies; Mrs. Wright, Dr. Wright, and James are insureds under all three policies. Under the policy issued to Mrs. Wright, State Farm paid $100,000 to the estate of Dr. Wright. It has also been stipulated that $100,000 is available to James for his injuries. This claim and Mrs. Wright's and James's claims for loss of consortium are pending in the Montgomery County Court of Common Pleas as Wright v. State Farm Fire andCas. Co., Case No. 01-CV-3437. Mrs. Wright has settled the claim for her own personal injuries.
 {¶ 8} 3. An umbrella policy providing uninsured/underinsured motorist coverage issued by State Farm Fire and Casualty Company to Dr. Wright and Mrs. Wright and insuring both them and James. State Farm paid the policy limit of $1 million to the estate of Dr. Wright.
 {¶ 9} 4. A business policy issued to Dr. Wright's employer, South Dayton Urological Associates, Inc., by State Farm Fire and Casualty Company with a limit of $2 million. Mrs. Wright contends that this policy provides uninsured/underinsured motorist coverage by operation of law, and this policy is part of Case No. 01-CV-3437.
 {¶ 10} 5. A healthcare excess liability policy issued to Miami Valley Hospital by MedAmerica International Insurance, Ltd. with a limit of $25 million. Mrs. Wright contends that this policy provides uninsured/underinsured motorist coverage by operation of law. The Montgomery County Court of Common Pleas granted summary judgment in favor of MedAmerica in Case No. 01-CV-3439, and this matter is now pending before this court as Wright v. MedAmerica Internatl. Ins., Ltd., Case No. 19809.
 {¶ 11} On September 9, 2002, the parties filed stipulated facts, and Mrs. Wright filed a motion for summary judgment. On September 10, 2002, Cincinnati filed a motion for summary judgment, arguing that the amounts already received by the plaintiffs should be setoff against the $1 million policy limit of the Cincinnati policy. Both sides filed responses on September 23, 2002. Mrs. Wright requested that resolution of the argument raised in Cincinnati's motion for summary judgment be deferred until coverage under all of the above-described policies had been determined. She further moved to have the cases consolidated for this purpose. On February 3, 2003, after replies had been filed, the trial court granted Cincinnati's motion and denied Mrs. Wright's motion.
 {¶ 12} Mrs. Wright appeals, raising four assignments of error.
 {¶ 13} "I. The Trial Court Erred In Denying Plaintiffs' Summary Judgment Motion Seeking UM/UIM Benefits And Granting The Insurer's Summary Judgment Motion Due To Payment Of UM/UIM Benefits By Other Insurers When R.C. 3937.18 Does Not Require UM/UIM Benefits To Set Off From UM/UIM Benefits."
 {¶ 14} Initially, we note that our review of the trial court's decision to grant summary judgment is de novo. See Helton v. Scioto Cty.Bd. of Commrs. (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See Stateex rel. Grady v. State Emp. Relations Bd. (1997), 78 Ohio St.3d 181,183, 1997-Ohio-221, 677 N.E.2d 343; Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64, 65-66, 375 N.E.2d 46. This standard will govern our review of each of the plaintiffs' assignments of error.
 {¶ 15} Under this assignment of error, Mrs. Wright argues that the trial court erred in its interpretation of R.C. 3937.18(A)(2). The trial court concluded that the statute required that the limits of the Cincinnati policy be reduced by the amounts received by the plaintiffs under other policies providing underinsured motorist coverage. We agree with Mrs. Wright's argument.
 {¶ 16} At the time applicable to this case, R.C. 3937.18, as amended by H.B. 261, provided:
 {¶ 17} "(A) No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless both of the following coverages are offered to persons insured under the policy for loss due to bodily injury or death suffered by such insureds:
 {¶ 18} "(1) Uninsured motorist coverage * * *.
 {¶ 19} "(2) Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage and shall provide protection for insureds thereunder against loss for bodily injury, sickness, or disease, including death, suffered by any person insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the insured's uninsured motorist coverage. Underinsured motorist coverage is not and shall not be excess insurance to other applicable liability coverages, and shall be provided only to afford the insured an amount of protection not greater than that which would be available under the insured's uninsured motorists coverage if the person or persons liable were uninsured at the time of the accident. The policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured."
 {¶ 20} This statute clearly mandates that the limits of an underinsured motorist policy be reduced by the amount available under applicable liability policies. See Clark v. Scarpelli, 91 Ohio St.3d 271,2001-Ohio-39, 744 N.E.2d 719. However, it does not, contrary to the trial court's analysis, require that the limits be setoff by amounts available under any applicable underinsured motorist policies. Rather, the statute requires that the limits of an underinsured motorist policy be reduced by the amounts available to the insured under "all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured." While Cincinnati attempts to argue that "persons liable to the insured" include not only the tortfeasor but also an insurance company providing underinsured motorist coverage, this argument is not logical given the language of the statute. Even if we were to construe "persons liable to the insured" to include insurance companies providing underinsured motorist coverage, the statute requires setoff of amounts available to the insured under insurance policies covering persons liable to the insured. An insurance company is not covered by a policy, it issues a policy. Therefore, we cannot read the statute to require setoff of amounts available from other underinsured motorist providers. Furthermore, Cincinnati appears to ultimately concede this point. Accordingly, we conclude that the trial court erred in its interpretation of the statute.
 {¶ 21} The first assignment of error is sustained.
 {¶ 22} "II. The Trial Court Erred In Denying Plaintiffs' Summary Judgment Motion Seeking UM/UIM Benefits And Granting The Insurer's Summary Judgment Motion Due To Payment Of UM/UIM Benefits By Other Insurers When The Policy Does Not Require That Other UM/UIM Coverage Be Set Off From UM/UIM Benefits."
 {¶ 23} Under this assignment of error, Mrs. Wright argues that the trial court erred in concluding that the Cincinnati policy provided that the policy limit of $1 million must be setoff by the amounts available to the plaintiffs from other applicable underinsured motorist policies. Although Cincinnati conceded that the statute did not mandate such a setoff, it argues that the statute does not prohibit policy language requiring such a setoff. We would agree. The statute appears to be neutral on this point, and we see no reason that Cincinnati could not write such a setoff provision into its policy. Therefore, the issue under this assignment of error is whether the Cincinnati policy does, in fact, require that its limits be reduced by the amounts available to the plaintiffs under other applicable underinsured motorist policies.
 {¶ 24} Cincinnati cites to the following policy language in support of its argument:
 {¶ 25} "D. Limit of Insurance
 {¶ 26} "* * *
 {¶ 27} "2. No one will be entitled to receive duplicate payments for the same elements of `loss' under this Coverage Form and any Liability Coverage Form.
 {¶ 28} "We will not make a duplicate payment under this Coverage Form for any element of `loss' for which payment has been made by or for anyone who is legally liable.
 {¶ 29} "3. With respect to coverage provided under Paragraph F.3.b of the definition of `uninsured motor vehicle,'[1] the limit of insurance shall be reduced by all sums paid for `bodily injury' by or on behalf of anyone who is legally liable.
 {¶ 30} "E. Change in Conditions
 {¶ 31} "The Conditions of the policy for Ohio Uninsured MotoristsInsurance are changed as follows:
 {¶ 32} "1. Other Insurance in the Business Auto * * * Coverage Forms are replaced by the following:
 {¶ 33} "If there is other applicable insurance available under one or more policies or provisions of coverage.
 {¶ 34} "a. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any coverage form or policy providing coverage on either a primary or excess basis.
 {¶ 35} "b. Any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible uninsured motorists insurance providing coverage on a primary basis.
 {¶ 36} "c. If the coverage under this Coverage Form is provided.
 {¶ 37} "(1) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable policy limits of liability for coverage on a primary basis.
 {¶ 38} "(2) On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis."
 {¶ 39} In its brief, Cincinnati appears to rely most heavily upon paragraph E.1.a of the above-quoted language. In its oral argument, Cincinnati relied most heavily on paragraph D.3. Because Cincinnati's argument is somewhat unclear, we will address the effect of each of the paragraphs above. Paragraph D.2 provides that Cincinnati will not make payments for losses already compensated pursuant to other insurance policies. In other words, it provides that an insured cannot recover more than the total amount of his or her loss. The total amount of loss in this case has yet to be determined; however, there is no argument that the plaintiffs have already been compensated for their entire loss. There is nothing in paragraph D.2 requiring that the limits of the Cincinnati policy be setoff by the amount of additional underinsured motorist benefits that plaintiffs are entitled to receive under any applicable policies.
 {¶ 40} Paragraph D.3 provides: "With respect to [underinsured motorist coverage], the limit of insurance shall be reduced by all sums paid for `bodily injury' by or on behalf of anyone who is legally liable." This paragraph, like R.C. 3937.18(A)(2) requires that, in the case of underinsured motorist coverage, the limits of the Cincinnati policy be setoff by the amounts paid pursuant to the tortfeasor's liability policy. It does not, however, provide for setoff of the amounts paid pursuant to underinsured motorist policies. Amounts paid pursuant to an underinsured motorist policy are by definition not paid "by or on behalf of anyone who is legally liable." An underinsured motorist policy applies when the amounts paid "by or on behalf of anyone who is legally liable" are insufficient to compensate an insured for his or her loss. While Cincinnati argues that we should interpret this phrase to include an insurance company, we believe that it clearly refers to persons legally liable for the accident. Furthermore, as Mrs. Wright argues, interpreting this section to require setoff of amounts paid under other underinsured motorist policies would result in inconsistency. This is because paragraph D.3 applies only to underinsured motorist coverage; there is no corresponding section for uninsured motorist coverage. This difference makes sense if we interpret the policy to require the setoff of amounts paid under liability policies. However, if we interpret the policy as urged by Cincinnati, the result would be that amounts paid under other underinsured motorist policies are setoff against the Cincinnati limit in underinsured motorist case but amounts paid under other uninsured motorist policies are not setoff against the Cincinnati limit in uninsured motorist cases. We cannot imagine that Cincinnati intended such a result. Therefore, we conclude that this paragraph does not require setoff by amounts available under other underinsured motorist policies.
 {¶ 41} Turning next to paragraph E.1.b, this paragraph clearly provides that, in this case, the underinsured motorist coverage under the Cincinnati policy is excess coverage to any primary underinsured motorist coverage. E.1.c.(1) is inapplicable, and E.1.c.(2) describes how amounts will be paid, with Cincinnati paying only its pro rata share of the loss relative to any other excess underinsured motorist providers. Thus, Cincinnati is an excess underinsured motorist insurer in this case and pays only after all applicable liability and primary underinsured motorist providers have paid. Nothing in these paragraphs, however, requires that the $1 million limit of the Cincinnati policy be setoff by the amounts paid by other underinsured motorist carriers.
 {¶ 42} Finally, Cincinnati argues that paragraph E.1.a provides for setoff of the amounts paid to the plaintiffs pursuant to other underinsured motorist policies. That paragraph provides: "The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any coverage form or policy providing coverage on either a primary or excess basis." Cincinnati argues in its brief that this paragraph means that the total recovery under all policies cannot exceed the highest applicable limit under any applicable Cincinnati policy, i.e. that all amounts received by the plaintiffs under liability or underinsured motorist policies must be setoff against the limit of Cincinnati's policy. Thus, because the plaintiffs have already received in excess of Cincinnati's limit, they are not entitled to receive anything from Cincinnati. (We note that, in its oral argument, Cincinnati did not make this argument, and, in fact, appeared to concede that the paragraph merely prevented the stacking of multiple limits, as described below.)
 {¶ 43} We disagree with Cincinnati's interpretation. Rather, we read this paragraph to provide that an insured cannot stack the limits of all applicable policies. In other words, assuming all policies in this case are applicable, the plaintiffs cannot recover $25 million plus $2 million plus $1 million plus $1 million and so forth. They can only recover an amount equal to the highest limit of any applicable policy. Therefore, in this case, assuming that the $25 million policy is applicable, the plaintiffs could recover a maximum of $25 million. If the $25 million policy is inapplicable, but the $2 million policy is applicable, then the plaintiffs could recover a maximum of $2 million. The other paragraphs discussed above further describe when any payment by Cincinnati would be made. If, after payment had been made under all applicable liability policies and primary underinsured motorist policies, the plaintiffs had not been compensated for the total amount of their loss and had not yet been paid an amount equal to the highest applicable policy limit, Cincinnati would be responsible as an excess insurer for its pro rata share of the balance of the plaintiffs' loss or the balance of the highest applicable policy limit, whichever was lower, provided that Cincinnati would not be responsible for more than its $1 million policy limit.
 {¶ 44} The cases cited by Cincinnati in support of its interpretation do not hold to the contrary. In Bertsch v. NationwideMut. Ins. Co., Richland App. No. 02 CA 49, 2003-Ohio-1105, the Fifth Appellate District considered Nationwide's argument that its coverage was not primary to the coverage of several Scott-Pontzer insurers. Nationwide argued that all applicable policies provided primary coverage. Considering language in the Scott-Pontzer insurers' policies identical to that in paragraph E above, the court held that the Scott-Pontzer insurers provided excess, rather than primary, coverage. Id. at ¶ 17, 26. The court then concluded: "Nationwide's UM/UIM coverage is primary up to its policy limits of $100,000. The policies issued by the Scott-Pontzer
insurers provide excess coverage. As noted above, the parties stipulated that appellee's total damages were $100,000. After setting off the amount Appellee Bertsch previously received from the estate of the decedent, appellee is entitled to receive, from Nationwide, $87,617.75." Id. at ¶ 27
 {¶ 45} Nothing in Bertsch is contrary to our decision here. We have already determined that Cincinnati's policy provides that it is an excess underinsured motorist provider in this case. However, this is not the same thing as providing that amounts paid by primary underinsured motorist providers must be setoff against Cincinnati's limit, and Cincinnati misreads Bertsch in its argument that the case setoff the amount paid by Nationwide against the limits of the excess insurers. TheBertsch court never reached that issue and, in fact, did not interpret paragraph E.1.a. Rather, the court concluded that, as a primary underinsured motorist insurer, Nationwide had to pay first to the limits of its policy. The total amount of damages did not exceed the limits of Nationwide's policy, so there were no damages left to be paid by the excess insurers. We do not disagree with this decision. However, it is not instructive on the point at issue here.
 {¶ 46} In another Fifth District case, Rudish v. Jennings, Stark App. No. 2002CA00268, 2003-Ohio-1253, ¶ 23, that court again found that a Scott-Pontzer insurer was an excess underinsured motorist provider. Again, however, the court did not address the setoff issue and explicitly did not discuss the provisions that Cincinnati argues provide for setoff of amounts paid under underinsured motorist policies. Id. at ¶ 24. As stated above, we agree that Cincinnati is an excess underinsured motorist insurer; however, this determination is irrelevant to the setoff issue.
 {¶ 47} In short, nothing in the language cited by Cincinnati provides for the policy limits to be setoff by amounts available for payment under other underinsured motorist policies. At the very least, the policy is susceptible to more than one interpretation, in which case we must interpret the policy in favor of the insured. See Scott-Pontzer, supra, at 665. Therefore, we must conclude that the policy does not provide for amounts paid by other underinsured motorist providers to be setoff against Cincinnati's limit. The trial court erred in so concluding.
 {¶ 48} The second assignment of error is sustained.
 {¶ 49} "III. The Trial Court Erred In Denying Plaintiff's Motion To Delay Summary Judgment Proceedings As To The Insurer's Set Off Argument When The Trial Court's Determination Of That Issue Was Premature."
 {¶ 50} Under this assignment of error, Mrs. Wright argues that the trial court erred in deciding Cincinnati's motion for summary judgment before it had been determined which policies were applicable. We agree. Pursuant to our discussion under the second assignment of error, supra, Cincinnati's liability, if any, cannot be determined until it is known which policies are applicable, which policies provide primary underinsured motorist coverage rather than excess coverage, and how much will be paid under each applicable policy. Accordingly, the trial court should have deferred decision on Cincinnati's motion until these issues were resolved.
 {¶ 51} The third assignment of error is sustained.
 {¶ 52} "IV. The Trial Court Erred In Denying Plaintiffs' Summary Judgment Motion Seeking UM/UIM Benefits And Granting The Insurer's Summary Judgment Motion On Coverage."
 {¶ 53} Under this assignment of error, Mrs. Wright contends that the trial court erred in denying her motion for summary judgment on the issue of whether the Cincinnati policy provided coverage for the accident at issue. Cincinnati argues that there is not coverage under the policy because the plaintiffs were not occupying a covered auto at the time of the accident.
 {¶ 54} The parties concede that Mrs. Wright, Dr. Wright, and James are insureds under the definition of "Who is an Insured" in the Ohio Uninsured Motorists Endorsement. That definition provides:
 {¶ 55} "B. Who is an Insured
 {¶ 56} "1. You.
 {¶ 57} "2. If you are an individual, any `family member'.
 {¶ 58} "3. Anyone else `occupying' a covered `auto' or a temporary substitute for a covered `auto'. The covered `auto' must be out of service because of its breakdown, repair, servicing, loss or destruction.
 {¶ 59} "4. Anyone for damages he or she is entitled to recover because of `bodily injury' sustained by another `insured'."
 {¶ 60} This definition of "insured" is identical to that inScott-Pontzer, which held that "you" includes a corporation's employees where "you" is defined as the named insured and the named insured is the corporation. Scott-Pontzer, supra, at 664-65. Thus, this definition would provide coverage to Mrs. Wright under paragraph 1, Dr. Wright and James under paragraph 2, and Mrs. Wright and James for their loss of consortium claims relating to Dr. Wright under paragraph 4.
 {¶ 61} Cincinnati argues, however, that a prerequisite to coverage under the uninsured motorist endorsement is that the insured sustain injury while operating or occupying a "covered auto." It is conceded that the automobile involved in this accident, which belonged to James O. Wright, Sr., was not a covered auto under the policy. Mrs. Wright, however, argues that the policy is ambiguous regarding whether the insured must have been occupying a covered auto at the time of the injury. We addressed similar policy language in Batteiger v. AllstateIns. Co., Miami App. No. 2001 CA 37, 2002-Ohio-909.
 {¶ 62} In Batteiger, we held that the policy at issue was ambiguous regarding whether the insured had to be occupying a covered auto in order for coverage to apply. Id. Our conclusion that the policy was ambiguous was based upon three factors. First, although the business auto portion of the policy provided that coverage was limited to an insured operating or occupying a covered auto, that requirement was not reiterated in the uninsured motorist endorsement. Id. Second, we concluded that the definition of an "insured" created ambiguity because the third paragraph specified that "anyone else" must be occupying a covered auto while the remaining paragraphs did not state that the insured must be occupying a covered auto. Id. We held that this created ambiguity as to whether the insureds under the remaining paragraphs must be occupying a covered auto. Id.
 {¶ 63} Finally, we reviewed an exclusion in the uninsured motorists endorsement, which provided:
 {¶ 64} "The `Exclusions' section of the uninsured motorist coverage form excludes: {¶ 65} "5. `Bodily injury' sustained by:
 {¶ 66} "a. You while `occupying' or when struck by any vehicle owned by you that is not a covered `auto' for Uninsured Motorists Coverage under this Coverage Form; {¶ 67} "b. Any `family member' while `occupying' or when struck by any vehicle owned by that `family member' that is not a covered `auto' for Uninsured Motorists Coverage under this Coverage Form; or
 {¶ 68} "c. Any `family member' while `occupying' or when struck by any vehicle owned by you that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy." Id.
 {¶ 69} We held that, if we were to interpret the policy to require that the insured be occupying a covered auto, these exclusions would be meaningless because "[t]here would be no reason to exclude three specific situations involving a non-covered auto if all situations involving non-covered autos were excluded." Id. Mrs. Wright argues that the Cincinnati policy contains the same ambiguities identified in the policy at issue in Batteiger. Therefore, because we must construe the policy "liberally in favor of the insured and strictly against the insurer,"Scott-Pontzer, supra, at 665, we should conclude that the plaintiffs were not required to be occupying a covered auto at the time of the accident for there to be coverage under the Cincinnati policy.
 {¶ 70} The Cincinnati policy is not identical to the policy inBatteiger. Although the definition of "Who is an Insured" is identical, the Cincinnati policy does not contain the exclusions present in the policy at issue in Batteiger. Rather, the other-owned vehicle exclusion in the Cincinnati policy provides that the insurance does not apply to: "5. `Bodily injury' sustained by an `insured' while the `insured' is operating or occupying a motor vehicle owned by, furnished to, or available for the regular use of a named insured, a spouse or a resident relative of a named insured, if the motor vehicle is not specifically identified in the policy under which a claim is made, or is not a newly acquired or replacement motor vehicle covered under the terms of the policy under which the uninsured and underinsured motorist coverages are provided." Furthermore, unlike the policy at issue in Batteiger, the Cincinnati policy provides that the uninsured motorist endorsement modifies the business auto coverage "[f]or a covered auto licensed or principally garaged in * * * Ohio." Based upon these differences, Cincinnati argues that its policy is distinguishable from the policy at issue in Batteiger and is unambiguous regarding the requirement that the insured be occupying a covered auto.
 {¶ 71} We disagree with Cincinnati's argument. Although the Cincinnati policy is not possessed of all the same ambiguities present in the policy at issue in Batteiger, it is nevertheless ambiguous. The definition of "Who is an Insured" is identical to the definition inBatteiger and creates ambiguity in the uninsured motorist endorsement for the same reasons. With regard to the exclusion, although it does not specifically use the term "covered auto", it would still be unnecessary and meaningless if we were to interpret the policy to require that an insured always be occupying a covered auto to be entitled to coverage. Finally, although the Cincinnati policy does provide that the uninsured motorist endorsement modifies the business auto policy for covered autos, it does not provide that an insured must be occupying a covered auto for uninsured motorist coverage to apply. In any case, this statement does not remove the ambiguity present in the policy because, even if this statement is read to require an insured to be occupying a covered auto to be entitled to coverage, the definition of "Who is an Insured" and the exclusion appear to provide that an insured does not always have to be occupying a covered auto to be entitled to coverage. The policy does not unambiguously provide that an insured must be operating a covered auto for uninsured motorist coverage to apply. Because it is ambiguous, we must interpret it in favor of the insured. SeeScott-Pontzer, supra, at 665.
 {¶ 72} Accordingly, we conclude that the trial court erred in denying Mrs. Wright's motion for summary judgment.
 {¶ 73} The fourth assignment of error is sustained.
 {¶ 74} The judgment of the trial court will be reversed, and this matter remanded for further proceedings consistent with this opinion.
GRADY, J. and YOUNG, J., concur.
[1] Paragraph F.3.b of the definition of "uninsured motor vehicle" refers to an underinsured motor vehicle, or a vehicle "for which the sum of all liability bonds or policies applicable at the time of an `accident' provides at least the amounts required by the applicable law where a covered `auto' is principally garaged but their limits are less than the Limit of Insurance of this coverage." In an argument confined to its oral argument, Cincinnati contends that we should read this section to provide that underinsured motorist coverage applies when the sum of all liability bonds or any other policies, including underinsured motorist coverage, applicable at the time of an accident are less than the limit of the uninsured motorist coverage. However, we do not believe that this is a legitimate interpretation of the policy language. Rather, we believe that the policy is meant to be read with "all liability" modifying both "bonds" and "policies applicable at the time of an accident."