OPINION
{¶ 1} Plaintiff-appellant, the Central States College of Health Sciences, Inc. ("CSC" or "the institution") appeals from the December 7, 2005, judgment entry of the Franklin County Court of Common Pleas, which granted the motion of defendant-appellee, Ohio Board of Regents ("Regents"), for summary judgment. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} We recount the corporate history of CSC to facilitate an understanding of the issues presented by this appeal. CSC was first incorporated on January 26, 1939, under the name, "Ohio State College of Physiatric Medicine." Two months later, the articles of incorporation were amended to reflect several changes, including the institution's change of name to "Central States College of Physiatrics" (also referred to as "Central States College of Physiatrics/CSC"). Although the record regarding the institution's corporate filings is sparse, it does appear that Central States College of Physiatrics filed a statement of continued existence on April 6, 1960, with the Ohio Secretary of State.
 {¶ 3} Central States College of Physiatrics was recognized by the Ohio Medical Board ("the Board") as an institution providing instruction in a limited branch of medicine, and enjoyed such status until the death of its founder, Dr. Harry Spitler. Thereafter, the institution came under new ownership, and that change necessitated the new owner to seek Board approval. The Education Committee of the Board inspected Central States College of Physiatrics, and recommended that the Board deny its request for approval.[1] As reflected in the minutes of the June 15, 1962, medical board meeting, the Board adopted that recommendation, and ordered the institution's remaining student be transferred to another school.[2] In accordance with the Board's decision, Central States College of Physiatrics transferred its last student and ceased its operation. In 1970, the Secretary of State cancelled its corporate charter.
 {¶ 4} In 1994, Robert McKinney ("McKinney") resurrected the corporate charter of Central States College of Physiatrics.[3] Prior to that time, McKinney was not involved with, and had no relationship to, Central States College of Physiatrics. On April 19, 1995, McKinney changed the institution's name to "Central States College of Health Sciences."
 {¶ 5} In a letter dated April 13, 1995, Rayma E. Smith, M.D. ("Dr. Smith"), Director of Degree Programs for Regents, wrote to Dr. Randall Bradley ("Dr. Bradley") at the Council on Naturopathic Medical Education, and advised him that Ohio law required nonprofit collegiate institutions to obtain Board approval, and as of the date of that letter, CSC had not yet received authorization from the Board to offer collegiate level instruction in the state of Ohio. In a subsequent letter dated September 23, 1996, Dr. Smith wrote Dr. Bradley and advised him that "[b]ecause of the College's existence before October 1, 1967, Central States is therefore not legally required to hold a Certificate of Authorization from the Board of Regents for the purposes of operating `a teaching and research institution for graduate and undergraduate instruction in physiatrics.'" (Appendix to Appellee's Merit Brief at 10.)
 {¶ 6} Subsequently, however, Regents retreated from its previous position that CSC did not need to obtain a certificate of authorization in order to hold itself out as an institution offering instruction. In a letter to McKinney dated August 6, 2004, Jack Connell, Regents' Assistant Director for Academic and Access Programs, wrote:
 One of the Ohio Board of Regents' statutory duties is to grant certificates of authorization, pursuant to Chapter 1713 of the Ohio Revised Code, to independent, non-profit post-secondary institutions that intend to offer or offer degree programs within the state. The Board of Regents is aware that Central States College was initially established in 1939 as the Central States College of Physiatrics and conferred the Doctor of Mechanotherapy and Doctor of Naturopathy degrees. We also understand that the College previously maintained it did not require a certificate of authorization since it was incorporated as an Ohio non-profit prior to October 13, 1967 [Chapter 1713.02(D)].
 A recent Central States College catalog explains that "In July of 1994 the charter of Central States College of Physiatrics was obtained from the Ohio Secretary of State and reincorporated by Robert T. McKinney and David J. Joseph, Jr." Documents filed with the Ohio Secretary of State show that the College's Articles of Incorporation were cancelled effective June 30, 1970. As of then, the exception in Ohio Revised Code Section 1713.02(D) ceased applicability to Central States College. Mr. Joseph's submission of an application to reinstate the College's Articles of Incorporation in July 1994 did not allow it to commence operations after twenty-four years without securing the appropriate certificate of authorization from the Ohio Board of Regents.
(Appendix to appellee's appellate brief at 49.).
 {¶ 7} Faced with the prospect of having to meet the formal requirements in order to secure authorization from Regents, CSC initiated this action on December 17, 2005, seeking declaratory relief. In its complaint, CSC sought declaration that it is not required to obtain a certificate of authorization from Regents in order to operate, and that pursuant to R.C. 1713.02, it is entitled to receive a certificate of authorization. Regents moved for summary judgment, and on December 11, 2005, the trial court granted its motion. In its decision, the court cogently explained:
 Plaintiff asks this Court to declare that "pursuant to R.C. 1713.02, Central States may identify itself as a college and confer degrees without obtaining a certificate of authorization from the Ohio Board of Regents." To the contrary this Court hereby declares that Central States (1) ceased to be an "institution" pursuant to R.C. 1713.01 sometime between 1967 and 1970, (2) was not reestablished as an institution until sometime after 1992, (3) is therefore an institution as defined by R.C. 1713.01(A) that was established after October 13, 1967, and (4) is therefore prohibited under R.C. 1713.02(B) from identifying itself as a "college" or from conferring degrees until it obtains a certificate of authorization from the Ohio Board of Regents.
 R.C. 1702.60 does not change this result. That section provides that "upon reinstatement of a corporation's articles of incorporation * * * the rights privileges, and franchises * * * of the corporation existing at the time its articles of incorporation were cancelled shall be fully vested in the corporation as if the articles had not been cancelled." (Emphasis added.) Since rights and privileges are fully vested in the corporation "as if the articles had not been cancelled," those rights and privileges that would have been lost even if the articles had never been cancelled are not retained by virtue of R.C. 1702.60. When Central States ceased to offer or intend to offer instruction or courses in the areas described in R.C. 1713.01(A)(2), it ceased to be an institution as defined by R.C. 1713.01, and this would have been true even if its articles of incorporation had never been cancelled. Accordingly, R.C. 1702.60 does not prevent this Court from regarding Central States as an institution that was reestablished after 1967 and therefore subject to the prohibition set forth in R.C. 1713.02(B).
(Decision and Entry filed Dec. 7, 2005.)
 {¶ 8} CSC filed a timely appeal, and brings a single assignment of error for our review:
 THE TRIAL COURT ERRED WHEN IT FOUND THAT, PURSUANT TO R.C. 1713.01, PLAINTIFF/APPELLANT WAS NO LONGER AN INSTITUTION BETWEEN 1967 AND 1970.
 {¶ 9} In its appeal, CSC challenges the trial court's grant of summary judgment in favor of the Board, raising primarily issues of statutory interpretation. Both the propriety of summary judgment and questions of statutory interpretation are subject to de novo review by this court. See Donnelly v. Kashnier, Medina App. No. 02CA0051-M, 2003-Ohio-639, at ¶ 26 ("[statutory interpretation involves a question of law; therefore, we do not give deference to the trial court's determination").
 {¶ 10} The starting point of our analysis is R.C. 1713.01(A), which provides, in pertinent part:
 As used in sections 1713.01 to 1713.06 of the Revised Code, "institution" includes:
 (A) Any nonprofit university, college, academy, school, or other institution, incorporated or unincorporated, that does any of the following:
 * * *
 (2) Offers or intends to offer instruction in the arts and sciences, teacher education, business administration, engineering, philosophy, literature, fine arts, law, medicine, nursing, social work, theology and other recognized academic and professional fields of study, and awards or intends to award degrees for fulfilling requirements of academic work beyond high school; * * *
 {¶ 11} If CSC qualifies as an institution under the above statute, then analysis proceeds to determine whether it is entitled to a certificate of authorization pursuant to one of the exemptions found in R.C. 1713.02. That statute provides:
 (B) Except as provided in division (E) of this section, no nonprofit institution or corporation of the type described in division (A) of section 1713.01 of the Revised Code that is established after October 13, 1967, may confer degrees, diplomas, or other written evidences of proficiency or achievement, until it has received a certificate of authorization issued by the Ohio board of regents, nor shall any such institution or corporation identify itself as a "college" or "university" unless it has received a certificate of authorization from the board.
 (C) Except as provided in division (E) of this section, no institution of the type described in division (A)(3) or (B) of section 1713.01 of the Revised Code that intends to offer or offers a course or courses within this state, but that did not offer a course or courses within this state on or before October 13, 1967, may confer degrees, diplomas, or other written evidences of proficiency or achievement or offer any course or courses within this state until it has received a certificate of authorization from the Ohio board of regents, nor shall the institution identify itself as a "college" or "university" unless it has received such a certificate from the board.
 {¶ 12} CSC asserts the trial court erred by narrowly construing the definition of an "institution" under R.C. 1713.01. It contends that according to the articles of incorporation filed in 1939, "the purpose of Central States is singular; i.e., to provide a teaching and research institution for graduate and undergraduate instruction." (Appellant's brief at 10.) Thus, CSC argues that the phrase " `intends to offer instruction' can only apply when an institution is not currently operating in some fashion. Logically, that is the only time an institution can `intend to offer instruction.'" (Appellant's brief at 10.) CSC maintains it has always been an "institution" due to its singular purpose of providing instruction or intending to provide instruction, and as such, it qualifies for the exemption found in R.C.1713.02(B). Similarly, CSC argues that it is likewise entitled to a certificate under R.C. 1713.02(C), which exempts institutions that offered "a course or courses within this state on or before October 13, 1967" from meeting the formal registration requirements. (Appellant's reply brief at 3.) Thus, according to CSC, it is entitled to a certificate under either subsection, as neither exemption is "based upon the standing of the institution on the applicable date, and the latter exemption does not require that such course or courses were offered on the date in question." Id.
 {¶ 13} Regents counters by asserting that CSC ceased to be an institution in June 1962, when the Board denied Central States College of Physiatrics' request for approval. It further contends that CSC's cessation of activity following the Board's denial takes it outside the scope of consideration as an institution "established" before October 13, 1967. Regents argues that CSC's theory of the case is juxtaposed with the purpose of grandfather clauses (demonstrated competence), generally, and the overall legislative scheme of Chapter R.C. 1713. And, according to Regents, the facts of this case demonstrate just the opposite. Finally, Regents asserts that legislative intent is thwarted by any individual or entity that assumes the identity of an institution no longer in operation/existence, and then seeks to circumvent the statutory criteria for certification by claiming to be exempt from the same under the grandfather clauses found in R.C. 1713.02(B) and R.C.1713.02(C).
 {¶ 14} "The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the law-making body which enacted it." Slingluff v. Weaver (1902), 66 Ohio St. 621, paragraph one of the syllabus. The first step in such an analysis is to determine whether the statute under review is ambiguous. State v.Hairston, 101 Ohio St.3d 308, 309, 2004-Ohio-969, at ¶ 11. "But the intent of the lawmakers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law-making body, there is no occasion to resort to other means of interpretation. The question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact. That body should be held to mean what it has plainly expressed, and hence no room is left for construction." Id. at ¶ 12, quoting Slinghuff, supra, at paragraph two of the syllabus.
 {¶ 15} In reviewing the case sub judice under the foregoing analysis, we find R.C. 1713.01 is not ambiguous and leaves no room for construction. It is undisputed that CSC ceased operating as a college in June 1962, when the Board denied its request for approval. For Central States College of Physiatrics, the legal effect of the Board's decision meant that it was prohibited by law from operating as an institution.State ex rel. Copeland v. State Medical Bd. (1923), 107 Ohio St. 20, 28
("The underlying purpose of conferring upon the board the power to issue licenses to practice medicine and surgery is protection against inexperience and incompetency."). The statute clearly contemplates that an entity, in order to meet the definition of "institution," was operating in some capacity on the effective date; otherwise, how could it "offer or intend to offer instruction?" In our view, the fact that CSC may have maintained its corporate status with the secretary of state during the critical period (1962-1967) is wholly irrelevant as to whether it can be deemed an institution under R.C. 1713.01. Putting that issue aside, we sua sponte note that there is no evidence in the record to suggest that CSC had any actual plan to "offer or intend to offer instruction" on the effective date of the statute, which, presumably, is due to the fact CSC ceased operating five years prior thereto.
 {¶ 16} Although CSC argues that the only time an institution can intend to offer instruction is when it is "not currently operating in some fashion," (appellant's brief at 10), the undisputed facts of this case disclose that CSC was not operating in any fashion, nor could it by law — and that fact is significant. In State ex rel. Eberts v. OhioState Med. Bd., (1899), 60 Ohio St. 21, the court held that an individual, who had practiced medicine in violation of a statute, which made it unlawful for any person who had not graduated from a medical school to practice medicine, could not avail himself of the grandfather clause in the statute exempting physicians from such requirements if they had been in practice for ten years. The court acknowledged that the statute did not define, or otherwise explain, what constituted a legal practitioner, and further noted that Eberts had, in fact, practiced medicine for the requisite period of time. Nonetheless, it rejected Eberts' argument, explaining:
 The proposition that one might enter upon the practice of medicine * * * in violation of the terms of a penal statute, and by persisting in such practice for ten years acquire the status of a legal practitioner cannot be reconciled with the obvious purpose of the statute.
Id. at 25-26. See, also, In the matter of Garrison King (N.Y.App. 1959),9 A.D.2d 822, appeal dismissed, (1960), 203 N.Y.S.2d 911. Considering the issues presented by this appeal in light of Eberts, the essence and practical import of that case are certainly applicable here.
 {¶ 17} Even if CSC could get over that hurdle, it still would not be entitled to a certificate pursuant to the exemptions found R.C.1713.02(B) and 1713.02(C). The threshold requirement for institutions seeking certification under those subsections is that the institution was established on or before October 13, 1967. And here, we find that CSC ceased to be "established" as an institution subsequent to the Board's denial.
 {¶ 18} CSC also argues the trial court incorrectly interpreted R.C.1702.60, which essentially gives a corporation whatever rights or privileges it had when its articles of incorporation lapsed. Thus, according to CSC, it is "as eligible for the exemption set forth in R.C.1713.02 as it would have been had its Articles of Incorporation never been cancelled." (Appellant's brief at 10.)
 {¶ 19} We agree with the trial court's conclusion that this statute does not "change" the end result, which is that CSC is not an "institution," as that term is defined by R.C. 1713.01, and as a result of its inactivity during the critical period, it cannot be deemed as having been "established" before October 13, 1967. An application of R.C. 1702.60 compels us to conclude that CSC had no greater rights in 1970, when its corporate charter was cancelled, as it did in 1994, when McKinney reinstated CSC's corporate status with the Secretary of State. In this regard, Regents correctly points out that CSC's argument involving R.C. 1702.60 "does nothing more than take us back to the central question here: what effect does a party's abandoning regulated activity have on its ability to be grandfathered from regulation when it resumes that activity?" (Appellee's brief at 13.)
 {¶ 20} Based on the foregoing, we conclude that CSC's cessation of activity disqualifies it from seeking certification under the exemptions found in R.C. 1713.02(B) and 1713.02(C). We find this result is consistent with legislative intent, and to hold otherwise, would run afoul of the well-established principle that statutes should be interpreted in a way that avoids unreasonable or absurd results.State ex rel. Dispatch Printing Co. v. Wells (1985), 18 Ohio St.3d 382,384.
 {¶ 21} We also find State ex rel. Kriedeman v. Upham (1927)116 Ohio St. 606, lends support to our determinations herein. In that case, Kriedman filed a mandamus action to compel the state medical board to issue him a certificate for the limited practice of medicine and surgery as chiropractics, under Section 1274-2,[4] of the General Code, which provided:
 [a]ny person, practicing in Ohio who at the time of the passage of this act shall actually be engaged in this state for a period of five years continuously prior to October first, 1915, in the practice of any one or more of the limited branches of medicine or surgery hereinbefore enumerated, and who shall present to and file with the state medical board an affidavit to that effect after the passage of this act shall be exempted from the examination, and shall be entitled to receive from said board a license to practice, upon the payment to said board of a fee of twenty-five dollars. The examination of all other applicants shall be conducted under rules prescribed by the board and at such times and places as the board may determine.
The court affirmed the decision of this court, which denied the writ, because Kriedman did not have the "continuous practice" necessary to entitle him to a certificate without examination. While Kriedman had, in fact, practiced chiropractic medicine during the five years immediately preceding the effective date of the statute, he did not have many patients, and during that same time period, also worked as a motorman and part-time conductor on a street railway. Despite the fact the statute did not define "continuously," the court found "[i]t would be absurd to claim that treatment of a very few patients during a period of five years would constitute a continuous practice during that period." Id. at 608. See, also, State ex rel. Schelosky v. Upham (1927)116 Ohio St 606 (under the same statute, the court held that an individual, who had no more than 180 patients during his period of actual practice as a chiropractor from 1905 to 1915, and during that same time, worked the day shift in a factory, was not entitled to a certificate to practice without examination).
 {¶ 22} Accordingly, we overrule CSC's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and FRENCH, JJ., concur.
[1] "The report of the Education Committee on inspections of the International Chiropractic College, Dayton, Ohio, (asked for approval to teach an additional course in Mechanotherapy) and the Central States College of Physiatrics, Eaton, Ohio (asking to be approved under new ownership since Dr. H. Riley Spitler, the former owner, died) did not approve the requests. A full report on each school is to be submitted later." (Minutes of April 3, 1962.)
[2] "The Central States College of Physiatrics, Eaton, Ohio, * * * is denied further recognition as a result of their inspection and belief that the school should no longer be recognized after the death of the former owner, H. Riley Spitler. This recommendation was unanimously approved by the Board on motion of Dr. Macedonia seconded by Dr. Merchant, and the Secretary directed to advise that any students now enrolled should be transferred to other schools." (Minutes of June 15, 1962.)
[3] It is interesting to note the timing involved — McKinney's corporate reinstatement of CSC came one month after he filed suit on behalf of Midwestern College of Massotherapy, a college that he owned and operated, challenging certain amendments promulgated by the Board to the massage therapy rules; amendments that threatened Midwestern's certification and licensure.
[4] Section 1274-2 is the forerunner to R.C. 4731.15, which regulates the limited branches of medicine. R.C. 4731.151 regulates the licensing of individuals engaged in the limited branch of mechanotherapy.