OPINION
{¶ 1} Appellant, Kelley Haddox ("Haddox"), appeals from a judgment of the Franklin County Court of Common Pleas affirming the order of the State Personnel Board of Review ("the SPRB") dismissing Haddox's appeal for lack of jurisdiction. Because the SPRB properly concluded it lacked jurisdiction to hear Haddox's R.C. Chapter 124 appeal, we affirm. *Page 2 
I. Factual Background {¶ 2} Haddox has been employed by the Ohio Attorney General's office ("AGO") since 1999. During the relevant time period, Haddox held the position of deputy assistant attorney general in the Workers' Compensation section, and her job responsibilities included representing the Bureau of Workers' Compensation, as well as supervising subordinate attorneys and handling disciplinary matters in that section. James Barnes ("Barnes") was Haddox's immediate supervisor.
 {¶ 3} During the summer of 2005, Haddox began to scrutinize the employment performance of one of her supervisees, Sandra Pinkerton ("Pinkerton"), who joined the AGO in January 2005. In addition to being assigned the duties of an assistant attorney general in the Workers' Compensation section, Pinkerton also volunteered for such projects as planning the section's annual legal education seminar that was scheduled for October 2005, organizing the fall 2005 office retreat for paralegals and other assistant attorney generals, as well as various other non-legal, but office-related functions.
 {¶ 4} Haddox grew displeased with Pinkerton's employment performance, and, in September 2005, began to voice her concerns, which included Pinkerton's failure to meet internal deadlines, failure to timely file court pleadings, failure to follow up on assigned matters, and failure to adhere to office policies and procedures. She additionally complained that Pinkerton was regularly tardy and excessively socialized during work hours. The sum total of Pinkerton's deficits, as perceived by Haddox, also led her to question the legitimacy of Pinkerton's compensatory time accrual. Haddox sent Barnes several emails, which set forth her concerns about Pinkerton. *Page 3 
 {¶ 5} On or about October 3, 2005, Haddox met with Pinkerton to address the above issues. Other than what appears to be an informal meeting, as evidenced by Haddox's handwritten post-counseling notes, the record does not indicate that Haddox requested formal action be taken against Pinkerton, or that any such action was ever taken. In fact, it appears that Haddox was the only person in a supervisory position that had concerns about Pinkerton's employment performance and/or her accrual of compensatory time.
 {¶ 6} In late October 2005, Haddox alleged that Barnes had knowingly omitted Pinkerton's name from an internal report that was submitted to AGO auditors, which detailed employee hours and accrual of compensatory time, because reporting Pinkerton's excessive accrual of compensatory time would reflect poorly on his management skills. Haddox discussed the omission of Pinkerton's name, as well as her frustrations regarding both Pinkerton and Barnes, with Keith Blosser ("Blosser"), who had been an assistant attorney with the AGO before taking a position with the Ohio Department of Insurance. Blosser called Melissa Iannotta ('Iannotta"), who was chief counsel for the AGO, on October 28, 2005, to discuss a situation he had heard about involving Haddox and Barnes, and "cryptically" informed Iannotta about a situation involving a discrepancy in the internal audit. (Confidential Memorandum authored by Iannotta, dated November 15, 2005, at 1 [Iannota's Memorandum].) Blosser's phone call concerned Iannotta, causing her to review the document that Blosser said contained false information. Iannotta confirmed that Pinkerton did not appear on the document, and, on November 3, 2005, she met with the AGO's in-house employment counsel, Eric Harrell ("Harrell"), to discuss the matter. *Page 4 
 {¶ 7} Later that same afternoon, Iannotta met with both Haddox and Barnes. Iannotta told them that she had received an anonymous phone call that had alleged Barnes falsified the internal audit by omitting Pinkerton. According to Iannotta's memorandum, Barnes became defensive and emphatically denied having done so, explaining that his secretary, Sheila Smith ("Smith"), had prepared the document. During the meeting, Haddox remained quiet, but when it was over and Barnes had left, she spoke to Iannotta and told her that she informed Barnes that Pinkerton's name had been omitted but he did not change it.
 {¶ 8} At that meeting, Haddox hand delivered to Iannotta a letter authored by Blosser ("the Blosser letter") dated November 3, 2005.[1]
In that letter, Blosser wrote that Haddox told him that Barnes "had probably knowingly falsified and submitted an audit report to [the AGO's] internal auditors." (Blosser letter at 1.) Blosser further explained that Haddox "was very distraught over this and was very upset that her boss (Barnes) would lie, and knowingly manipulate and submit false data to the Petro auditors." Id. Thus, based on what Blosser deemed to be "credible information," and in an effort to "help [Haddox] and help the AG administration," he "felt [he] had a duty to report the possible corruption and fraud that might have taken place in the Petro administration." Id. (Blosser letter at 1.) Blosser's letter also went on to praise Haddox's work performance and extol her virtues as a supervisor. He closed the letter by stating, "I hope you take no *Page 5 
negative disciplinary action on [Haddox], and would hope that you elevate her so her talents can be utilized to their fullest extent within the section." Id.
 {¶ 9} Immediately subsequent to the above events, Iannotta spoke with Smith, who explained that she prepared the audit with Barnes' information, and that she had also prepared a revised audit that included Pinkerton, as well as another assistant attorney general that had been omitted. Smith offered to instantaneously retrieve the revised document for Iannotta on her computer. Smith stated that the initial audit omitting Pinkerton was the result of an oversight, and denied that anyone (i.e., Barnes) had asked her to omit Pinkerton's name.
 {¶ 10} Thereafter, Iannotta spoke to Barnes to "get his side of the story, one-on-one." (Iannotta's memorandum, at 3.) Barnes explained that the document given to the auditors was not created for them, but, rather, one he created for himself[2], but given to the auditors as an example of how time accrual was being tracked for the section since the auditor's last visit. With respect to Haddox, Barnes described her management style as "harsh," and, given the current situation, he did not believe that he could continue to work with her. (Iannotta affidavit at 11.)
 {¶ 11} On November 7, 2005, Iannotta met with Harrell and Megan Kish ("Kish"), the AGO's human resource director. Kish advised Iannotta that Haddox had been disciplined on multiple occasions for harassment allegations that had been levied by several employees. A collective decision was made to separate Barnes and Haddox, *Page 6 
and, because Barnes had more seniority, as well as a "more mature management style," it was determined that Haddox should be the one transferred.
 {¶ 12} On November 14, 2005, Iannotta and Lana Ruebel ("Ruebel"), the AGO's chief of staff, met with Haddox to inform her that she would be transferred out of the workers' compensation section, and that she could choose the section to which she would be reassigned. Haddox indicated to Iannotta that the Health and Human Services section was her first transfer choice. In an email sent to Iannotta on November 15, 2005, Haddox requested that she be transferred as a principle attorney (as opposed to a senior attorney) because she did not want the "public perception" to be that she was demoted, and being transferred as a senior attorney would be "humiliating." (Haddox's memorandum contra to the AGO's motion to dismiss at exhibit 25.) The next day, Haddox sent another email to Iannotta, which reiterated her request to be transferred into the Health and Human Services section as a principle attorney, and further requested a salary of $75,000 per year. Iannotta replied to Haddox later that day, clarifying the offer made to Haddox on November 14, 2005, which was that the transfer would be to that of a senior attorney, not a principle attorney, and would not result in a reduction in pay. Id.
 {¶ 13} Given the gravity of the allegations alleged by Haddox regarding Barnes' falsification of the document given to the auditors, as well as the allegations levied by Blosser in his letter to Iannotta, David Meyer ("Meyer"), a special agent supervisor for the Ohio Bureau of Criminal Identification and Investigation, was asked to conduct an independent review of the matter. Meyer began his investigation on November 18, 2005, and concluded the same on December 19, 2005. He interviewed various individuals, *Page 7 
including Haddox, Barnes, Blosser, [3] Smith, and Pinkerton, and reviewed pertinent documents. Meyer's investigation, however, was unable to substantiate any of the claims asserted by Haddox and Blosser, and when the matter was presented to the Franklin County Prosecutor's Office, it reached the same conclusion.
II. Procedural Background {¶ 14} On December 9, 2005, Haddox appealed her section transfer to the SPRB, alleging that such action was taken as a result of protected disclosures she made in accordance with R.C. 124.341. The AGO moved to dismiss Haddox's appeal on the basis that she failed to meet the written-report requirement found in R.C. 124.341(A), and, therefore, the SPRB did not have subject-matter jurisdiction. The administrative law judge agreed, finding that:
 While it is clear from reading Appellant's e-mails to Mr. Barnes that she was not pleased with Ms. Pinkerton's job performance and the use of her time, these e-mails do not identify a violation of state or federal statutes or a misuse of public resources. Appellant's e-mails express her opinion concerning Ms. Pinkerton's work performance and the use of her time, an opinion that may or may not have been shared by Ms. Pinkerton's immediate supervisor (Dennis Hufstader) or Appellant's immediate supervisor (James Barnes). The concerns expressed in Appellant's e-mails do not equate to whistleblower activities as contemplated by O.R.C. 124.341(A); rather, they simply evidence Appellant's activities and responsibilities as a supervisor. Accordingly, Appellant's e-mails do not constitute a written report filed pursuant to O.R.C. 124.341(A). *Page 8 
(Hearing Officer's Report and Recommendation, at 3.) The administrative judge also rejected Haddox's claim that the Blosser letter constituted a written report under R.C. 124.341, explaining:
 Because the evidence established that Ms. Iannotta was not Mr. Blosser's supervisor and the Attorney General was not his appointing authority during the time period relevant to this appeal, Mr. Blosser's November 5, 2005 letter to Ms. Iannotta fails to meet the requirements of a written report filed pursuant to O.R.C. 124.341. Furthermore, the evidence established that Mr. Blosser had no personal first-hand knowledge regarding the issues set forth in his November 5, 2005 letter, and that he later revised statements made in his letter. Although the information contained in Mr. Blosser's November 5, 2005 letter was derived from a conversation that took place during a social lunch with Appellant, Appellant did not write this letter or sign it.
Id. at 4.
 {¶ 15} Following consideration of Haddox's objections, the SPRB adopted the administrative law judge's report and recommendation and dismissed Haddox's appeal. Haddox appealed that decision to the Franklin County Court of Common Pleas, which affirmed the SBPR's order.
III. Assignments of Error {¶ 16} Haddox filed a timely appeal, assigning the following errors:
 ASSIGNMENT OF ERROR NO. 1.
 The common pleas court erred as a matter of law in ruling that the written communications relied upon by Appellant as a report which discusses a state employee's misuse of the compensatory time benefit do not identify a violation of state statutes, rules, or regulations or the misuse of public resources. *Page 9 
 ASSIGNMENT OF ERROR NO. 2.
 The common pleas court erred as a matter of law in interpreting R.C. 124.341 to require that the reporting employee must be the author of the report and in rejecting the Blosser letter as a part of the written report.
 ASSIGNMENT OF ERROR NO. 3.
 The common pleas court's Decision is not in accordance with law because there were disputed issues of fact and the SPBR failed to hold a hearing to resolve those issues.
 {¶ 17} We will address these assignments of error together as they are interrelated. The collective thrust of the arguments presented by Haddox under these assignments of error is that the SPRB erred in determining that she did not satisfy the reporting requirements found in R.C. 124.341.
IV. Analysis
A. Standard of Review
 {¶ 18} Under R.C. 119.12, when a common pleas court reviews an order of an administrative agency, the common pleas court must consider the entire record to determine whether the agency's order is supported by reliable, probative and substantial evidence and is in accordance with law. Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108, 110-111. By contrast, an appellate court's review is more limited. ProvisionsPlus Inc. v. Ohio Liquor Control Comm., Franklin App. No. 03AP-670,2004-Ohio-592, at ¶ 8, citing Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619. The appellate court determines whether the trial court abused its discretion. Id. Absent an abuse of discretion, the appellate court may not substitute its judgment for that of the administrative *Page 10 
agency or the common pleas court. Id. An appellate court, however, has plenary review of purely legal questions. Id.
 {¶ 19} This appeal presents two questions: (1) can an employee whose normal duties encompass supervisory responsibilities, including the duties to investigate and report personnel issues, seek protection under R.C. 124.341 for written disclosures made in connection with the performance of those duties; and (2) is R.C. 124.341 satisfied when an employee delivers a written report, which the employee did not author. These questions are one of first impression for Ohio state courts.
B. R.C. 124.341
 {¶ 20} We begin our discussion with examining R.C. 124.341, which provides, in pertinent part:
 (A) If an employee in the classified or unclassified civil service becomes aware in the course of employment of a violation of state or federal statutes, rules, or regulations or the misuse of public resources, and the employee's supervisor or appointing authority has authority to correct the violation or misuse, the employee may file a written report identifying the violation or misuse with his supervisor or appointing authority. * * *
 If the employee reasonably believes that a violation or misuse of public resources is a criminal offense, the employee, in addition to or instead of filing a written report with the supervisor, appointing authority, or the office of internal auditing, may report it to a prosecuting attorney, director of law, village solicitor, or similar chief legal officer of a municipal corporation, to a peace officer, as defined in section 2935.01 of the Revised Code, or if the violation or misuse of public resources is within the jurisdiction of the inspector general, to the inspector general in accordance with section 121.46 of the Revised Code. In addition to that report, if the employee reasonably believes the violation or misuse is also a violation of Chapter 102., section 2921.42, or section 2921.43 of the *Page 11 
Revised Code, the employee may report it to the appropriate ethics commission.
 {¶ 21} This court had the occasion to construe R.C. 124.341 in Wade v. Ohio Bur. of Workers' Comp. (June 10, 1999), Franklin App. No. 98AP-997. In that decision, we explained:
 To invoke the jurisdiction of the SPBR and the protection of R.C. 124.341, therefore, a state employee must show: (1) a written report; (2) transmitted to his/her supervisor, appointing authority, the state inspector general, or other appropriate legal official which; (3) identifies a violation of state or federal statute, rule, or regulation, or a misuse of public resources. Although the state employee whistleblower statute has been very sparsely interpreted by the courts, it is noted that it shares many procedural similarities with Ohio's general private employee whistleblower statute, R.C. 4113.52, although the two are otherwise distinguished by significant substantive differences. Specifically, the burden of meeting the procedural requirements of either whistleblower statute is upon the employee, who bears the burden of demonstrating by a preponderance of the evidence the existence of a written report filed with the appropriate supervisor or other named authority and providing sufficient detail to identify and describe the alleged violation. Although no court has yet explicitly so stated, it would follow that the employee further bears the burden of establishing that the alleged retaliatory termination was in fact a retaliation for the whistleblower's protected activity, rather than based upon some other aspect of job performance.
Id. (citations omitted). As Wade suggests, the first step in our analysis is to determine whether the written disclosures relied upon by Haddox suffice under the statute.
C. Compliance with R.C. 124.341
 {¶ 22} Haddox maintains that her written communications, when considered individually and collectively, demonstrate that she complied with the reporting requirements set forth in the statute. The written communications, upon which Haddox *Page 12 
premises her argument include: (1) five email communications she sent to Barnes; (2) notes she took during her counseling session with Pinkerton; (3) the revised report given to the auditors; and (4) the Blosser letter. We will address each communication separately.
i. Email communications to Barnes.
 {¶ 23} The record contains five emails that Haddox sent to Barnes, each of which convey her concerns about Pinkerton's work performance. Only three of those five emails, however, mention Pinkerton's compensation time accrual. Thus, we will limit our discussion to those emails, which are set forth verbatim in order to allow a complete understanding of discussion that follows.
 {¶ 24} The first of the three emails was sent by Haddox to Barnes on September 9, 2005, and in which she states:
 I still don't understand why nothing ever gets done until I tell her to do it. Should I have to be prodding her along on a case like this? The response to the Motion in Limine was supposed to be to me by the end of the day on Wednesday. I got it at 8:00 p.m. last night. Also, as I've said before, I don't understand why she is here until 8:00 p.m. working when she talks and socializes the majority of the day. I observed her talking to Stephanie this morning for over 20 minutes regarding some high school football game. I hope that we are not approving comp time for her at night. Can we discuss this? Do you want me to butt out?
 {¶ 25} The second email was sent on September 13, 2005, and states:
 Given the issues we discussed recently regarding Sandy (missed deadlines, excessive socializing, etc.), I checked out her accrued compensatory time. I only went back four pay periods, but will be happy to go back further if you would like me to. Here is what I found out:
 7/23/05- 11 hours 36 minutes of comp time earned *Page 13 
 8/06/05- 18 hours 54 minutes of comp time earned
 8/20/05- No time sheet turned in
 9/03/05- 15 hours 12 minutes of comp time earned
 As I've indicated to you, I'm not sure what Sandy is doing with her time. Her caseload seems to be consistent with the other attorneys. We specifically asked her last week if it was a caseload issue, and she seemed to think not. I'm not sure why these comp hours are necessary, when the other attorneys are not putting in these numbers of hours. She seems to be socializing a large portion of the day and then needs to work evenings to actually get her work done. Again, I am grateful to Sandy for volunteering for CLE, Retreat, etc., but it is obviously taking away from the time that she can devote to her cases. Let me know if you want/need me to do anything else.
 {¶ 26} The third email that discusses Pinkerton's compensation time accrual was sent by Haddox on September 27, 2005, to Barnes, as well as Dennis Hufstader, Pinkerton's immediate supervisor, and reads:
 Gentlemen,
 I thought that I would pass this on to you. Although Charissa is the only person that this [sic] put this in writing, a number of employees in the section have been expressing the same concerns. I think that they would be even more upset if they were aware that Sandy has submitted a large amount of comp time for the past four pay periods (that is as far back as I went). During the last pay period Sandy submitted 2 and ½ hours of time on a Sunday to complete an appellate brief. She submitted an additional 6 hours of comp time for the same brief. She also submitted 6 and ½ hours of comp time for CLE and "team building." I'm not sure what "team building" means or why we are allowing her to earn comp time for it? Also, I was on the CLE committee last year. I know that I did not (nor did anyone who did the heavy lifting-Keith, Shareef, Diane, etc.) ask for comp time associated with preparing for the CLE. I thought that the expectation was that we did extra-curriculars in addition to our work in the 40 hour *Page 14 
work week? Lastly, Sandy is not arriving to work on time. The week of 9/4 through 9/10, she was on time once. She was also 35 minutes late yesterday. If she can't make it to work at 8:30 a.m., we need to have her switch her hours to 9:00 a.m.
 {¶ 27} The SPRB considered the above emails, concluding that while the same evidenced Haddox's supervisory responsibilities, they did not rise to the level of protected whistleblower disclosures. Haddox "admits that concerns about misuse of the compensatory time benefit by a subordinate are part of the normal duties of a supervisor," but argues that "such concession does not make the communicated `information' any less a proper subject of a `report.'" (Haddox's brief at 12.) According to Haddox, the question is not how she learned of the subject matter of her reports, but, rather, "whether the information communicated a misuse of public resources or a violation of law." Id. at 13. This argument, however, misses the mark.
 {¶ 28} Even though R.C. 124.341 was enacted in 1986 and we decidedWade almost a decade ago, case law discussing R.C. 124.341 remains scant. To the extent that state law discussing whether a supervisor who reports the misconduct of a subordinate as part of her normal supervisory duties may seek whistleblower protection for those same disclosures is not well-developed, we find federal case law interpreting an analogous federal statute, the Whistleblower Protection Act, Pub.L. Nos. 101-12, 103 Stat. 16 (1989), Section 2302, Title 5, U.S. Code ("WPA"), to be instructive.
 {¶ 29} In considering the design of the WPA, federal courts have recognized that its underlying purpose is "to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel."Willis v. Dept. of Agriculture (Fed. Cir., 1998), 141 F.3d 1139, 1144. InWillis, *Page 15 
the Federal Circuit Court held that a Department of Agriculture employee, whose job it was to review farms for compliance with United States Department of Agriculture regulations, could not seek protection under the WPA for disclosures he made regarding several farms that were out of compliance. The court explained:
 Part of Willis's job duties as a DC was to review the conservation compliance of farms within his area. In reporting some of them as being out of compliance, he did no more than carry out his required everyday job responsibilities. This is expected of all government employees pursuant to the fiduciary obligation which every employee owes to his employer. Willis cannot be said to have risked his personal job security by merely performing his required duties. Determining whether or not farms were out of compliance was part of his job performance and in no way did it place Willis at personal risk for the benefit of the public good and cannot itself constitute a protected disclosure under the WPA.
Id.
 {¶ 30} The federal circuit court, which decided Willis, further elaborated on the issue in Huffman v. Office of Personnel Mgt.
(Fed. Cir., 2001), 263 F.3d 1341. In Huffman, the court distinguished between three different situations: (1) an employee has, as part of her normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels; (2) an employee with such assigned investigatory responsibilities reports the wrongdoing outside of normal channels; and (3) an employee is obligated to report the wrongdoing, but such a report is not part of the employee's normal duties, or the employee has not been assigned those duties. Regarding the first scenario, which usually does not afford an employee protection under the WPA (and resembles the facts of this case), the court explained: *Page 16 
 [In this situation] the employee has, as part of his normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels. A law enforcement officer whose duties include the investigation of crime by government employees and reporting the results of an assigned investigation to his immediate supervisor is a quintessential example. Employees of an inspector general's office may be in a similar position. Willis holds that reporting in connection with assigned normal duties is not a protected disclosure covered by the Act. Id. While the language of the Act is ambiguous as to whether normal duties reports are covered, the core purposes of the WPA are simply not implicated by such reporting. Extending the WPA's protections to such situations would be inconsistent with the WPA's recognition of the importance of fostering the performance of normal work obligations and subjecting employees to normal, non-retaliatory discipline. See S. Rep. No. 100-413, at 15 (1988) ("The Committee does not intend that employees who are poor performers escape sanction by manufacturing a claim of whistleblowing . . ."); S. Rep. No. 95-969, at 8, reprinted in 1978 U.S.C.C.A.N. 2723, 2730-31 ("Nor would the bill protect employees who claim to be whistle blowers in order to avoid adverse action based on inadequate performance."). While dictionary definitions of the term "disclosure" obviously provide little assistance in determining whether Congress intended normal duties to be covered by the WPA, it is appropriate for us to interpret the statute in light of its central purpose. See Crandon v. United States, 494 U.S. 152, 158, 108 L. Ed. 2d 132, 110 S. Ct. 997 (1990) (holding that, in order to fully understand the meaning of a statute, it is proper to look "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy"); Massachusetts v. Morash, 490 U.S. 107, 115, 104 L. Ed. 2d 98, 109 S. Ct. 1668 (1989) (noting that "in expounding a statute, we [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (brackets and ellipses in original) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987)); Doyon Ltd. v. United States, 214 F.3d 1309, 1314
(Fed. Cir. 2000).
 We find no clear evidence in the legislative history of the WPA, apart from the history of the 1994 amendment discussed below, that the WPA was designed to trigger *Page 17 
protection for performance of normal duties. The WPA was established to protect employees who go above and beyond the call of duty and report infractions of law that are hidden. The situations which Congress specifically covered in 1978 and 1989 were disclosures to the press or to Congress itself. See, e.g., S. Rep. No. 100-413, at 12-13 (1988) (discussing disclosures to the media and Congress); S. Conf. Rep. No. 95-1272, at 131-132 (1978) (discussing disclosures to Congress); 95 Cong. Rec. H8473 (daily ed. Aug. 11, 1978) (statement of Rep. Schroeder) (discussing statements made to a congressional committee). As we previously stated in Willis, "the WPA is intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel." Willis, 141 F.3d at 1144.
Id. at 1352-1353 (footnotes omitted). See, also, Skare v. ExtendicareHealth Servs. (C.A.8, 2008), 515 F.3d 836; Sasse v. United StatesDOL (C.A.6, 2005), 409 F.3d 773.
 {¶ 31} A federal case that dealt with a supervisor reporting the misconduct of his employees is Anderson v. Dept. of Energy (Fed. Cir., 2004), 89 Fed.Appx. 711. In that case, the court affirmed the decision of the administrative judge, who denied the petitioner's federal WPA claim because "they were reports by him of misconduct on the part of individuals he supervised. They thus came within the scope of his normal job duties and were not protected under the WPA." Id. at 712.
 {¶ 32} Considering that the underlying purpose for R.C. 124.341 and the WPA is the same, with both statutes seeking to protect government employees who report violations or misuse of public funds, we find the reasoning of the federal courts is equally applicable to R.C. 124.341
under the specific facts of this case. Here, Haddox had a direct supervisory responsibility over Pinkerton, and, as such, she had a fiduciary duty to report her concerns. Thus, by questioning the legitimacy of Pinkerton's compen-sation-time accrual, Haddox was merely doing what she was expected to do as a *Page 18 
supervisor, and cannot be said to have risked her job to "blow the whistle" for the benefit of the citizens of Ohio. The tenor of Haddox's emails clearly evidence her frustrations as a supervisor with a subordinate's performance, and does not resemble that of a state employee whose concern is focused on the alleged violation or misuse.[4]
 {¶ 33} To accept Haddox's argument, and myopically view only the subject matter of the report without considering the context in which it was made, would transform every disclosure made by a state employee in a supervisory position into a protected whistleblower activity. We do not find this to be the purpose for which R.C. 124.341 was enacted, nor would the same further the legislature's laudatory goal of protecting whistleblowers. And, as one court astutely noted, such "would be to open the door for all compliance discussions to be viewed as `reports' that implicate the [Whistleblower] Act." Freeman v. Ace Tel. Asdn. (D.Minn., 2005), 404 F.Supp.2d 1127, 1141.
 {¶ 34} Further, given that R.C. 124.341 requires the written report to be made in good faith, it is both reasonable and logical to look at the context in which the report was made, as well as the content of the report. The independent research of this court has disclosed that at least one state has adopted that approach. In Kidwell v. Sybaritic,Inc. (Minn.Ct.App., 2008), 749 N.W.2d 855, the Minnesota Court of Appeals construed its equivalent of R.C. 4113.52, and held that "[a]n in-house attorney does not engage in conduct protected by the Minnesota Whistleblower Act if the alleged report of a violation *Page 19 
or suspected violation of law is a communication made to the client-employer in fulfillment of the attorney-employee's job responsibilities." Id., syllabus at paragraph two. The court analyzed the issue in terms of whether Kidwell made a "good faith" disclosure by looking at the purpose for which the report was made. The court explained:
 [A]n employee does not engage in protected conduct under the whistleblower act if the employee makes a report in fulfillment of the duties of his or her job. This rule is in harmony with the statutory requirement of `good faith,' Minn. Stat. § 181.932, subd. 1(a), and the caselaw instructing that `to determine whether a report . . . is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report.' In determining a `reporter's purpose,' the `central question is whether the reports were made for the purpose of . . . expos[ing] an illegality.' The caselaw essentially presumes that when an employee performs the duties of his or her job, the employee acts not with the purpose of exposing an illegality but, rather, only with the purpose of promoting the employer's interests. In this way, the rule is consistent with an attorney's most basic duties to his or her client — to be competent, to be diligent, to use good judgment, to render candid advice, and to avoid conflicts of interest. If a contrary rule were to govern, an in-house attorney might engage in protected activity every day because attorneys routinely work with laws and rules and routinely consider violations and suspected violations of laws and rules.
Id. at 866 (citations and quotations omitted).
 {¶ 35} Based on the foregoing discussion, we do not find that Haddox's email communications suffice the reporting requirements found in R.C. 124.341.
ii. Counseling notes.
 {¶ 36} Haddox also claims that the notes she took during her counseling session with Pinkerton evidence her concern regarding Pinkerton's accrual of compensation time. While a review of Haddox's notes disclose that compensation time accrual was one of the *Page 20 
issues she discussed with Pinkerton, that fact, without more, does not transform Haddox's handwritten notes into a report contemplated by R.C. 124.341. iii. Revised report given to the auditors.
 {¶ 37} Haddox also appears to claim that the revised report given to the auditors is evidence that her concern regarding Pinkerton's compensation-time accrual was well founded. Whether or not the revised report given to the auditors would support Haddox's contention is irrelevant, as the revised report does not constitute a report contemplated by R.C. 124.341.
iv. The Blosser letter.
 {¶ 38} Haddox argues that R.C. 124.341 does not require that the employee actually author or sign the written report, and that her delivery of the Blosser letter to Iannotta complies with the "filing" requirement set forth in the statute. (Haddox's brief at 14-15.) Thus, Haddox asserts that absent express language requiring the employee to author the report, this court must presume that the employee need not be its author as long as she files the same.
 {¶ 39} "The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the law-making body which enacted it." Cent. States College of Health Sciences Inc. v.Ohio Bd. of Regents, Franklin App. No. 06AP-35, 2007-Ohio-547, at ¶ 14, quoting Slingluff v. Weaver (1902), 66 Ohio St. 621, paragraph one of the syllabus. The first step in such an analysis is to determine whether the statute under review is ambiguous. State v. Hairston,101 Ohio St.3d 308, 309, 2004-Ohio-969, at ¶ 11. *Page 21 
 {¶ 40} Legislative intent "is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, * * * there is no occasion to resort to other means of interpretation. * * * That body should be held to mean what it has plainly expressed, and hence no room is left for construction." Hairston, supra, at ¶ 12, quoting Slinghuff, supra, at 621. If a term or phrase is not ambiguous, a court does not need to interpret it; it must simply apply it. Id. Benjamin v. Credit Gen. Ins.Co., Franklin App. No. 04AP-642, 2005-Ohio-1450, at ¶ 20 (stating that "[W]hen a statute conveys a meaning that is clear, unequivocal and definite, the statute must be applied as written"). Further, courts lack the authority to ignore the plain language of a statute under the guise of statutory interpretation or liberal or narrow construction.Covington v. Airborne Express, Inc., Franklin App. No. 03AP-733,2004-Ohio-6978. Rather, a court must give effect to the words used in the statute, accord the words their usual and customary meaning, and not delete words used or insert words that are not used. Cleveland Elec.Illum. Co. v. Cleveland (1988), 37 Ohio St.3d 50, paragraph three of the syllabus.
 {¶ 41} However, "[i]t is firmly established that a statute is ambiguous when its language is subject to more than one reasonable interpretation." Family Medicine Found., Inc. v. Bright,96 Ohio St.3d 183, 2002-Ohio-4034, at ¶ 8. "It is only where the words of a statute are ambiguous, are based upon an uncertain meaning, or there is an apparent conflict of some provisions, that a court has the right to interpret a statute." Drake-Lassie v. State Farm Ins. Cos. (1998), 129 Ohio App.3d 781, 788, citing Kroff v. Amrhein (1916), 94 Ohio St. 282,285 ("[T]he right to judicially interpret a duly enacted *Page 22 
statute is based upon some apparent uncertainty of meaning, some apparent ambiguity of terms, some apparent conflict of provision."), and R.C. 1.49.
 {¶ 42} Applying the above analysis, we find the presence of an ambiguity is a close call. While it is true that R.C. 124.341 does not expressly state that the employee must author the report, we are not entirely persuaded that the omission renders the statute's meaning uncertain, or that Haddox's interpretation is reasonable. Nevertheless, in light of the Supreme Court of Ohio's decisions in Family MedicineFound., Inc. supra, and Kroff, supra, we resolve the issue by finding that an ambiguity exists. Accordingly, we must look beyond the words of the statute and construe R.C. 124.341(A) in a manner that reflects the intent of the General Assembly. In doing so, "[w]e are guided by the rule that when a statute is ambiguous, the court, in determining the intent of the General Assembly, may consider the objective of the statute and the consequences of any particular construction." Clark v.Scarpelli (2001), 91 Ohio St.3d 271, 275, citing R.C. 1.49(A) and (E).
 {¶ 43} R.C. 124.341 concerns violations of state or federal statutes, rules or regulations, or the misuse of public resources. If a state employee becomes aware of any violation or misuse, the employee may file a written report with the employee's supervisor identifying the same. R.C. 124.341(A). Section (B) prohibits any disciplinary action to be taken against the employee "for making any report authorized by division (A)." Id. (emphasis added). The statute also contains a good-faith requirement, mandating the employee "make a reasonable effort to determine the accuracy of any information reported." R.C. 124.341(C). *Page 23 
 {¶ 44} As previously stated, the primary objective of R.C. 124.341 is to protect state employees who report violations or misuse from retaliation. In considering that objective, as well as construing R.C. 124.341 in toto, we conclude the Blosser letter does not meet the requirements of R.C. 124.341. Haddox seeks to invoke the protection of that statute, but did not write the letter, which content she relies on for that purpose. Retaliation based on the mere transmission of a report is tenuous at best, and the statutory scheme clearly contemplates that the employee making the report play a bigger role than that of a mere courier.
 {¶ 45} Based on the foregoing, we find that the Blosser letter does not constitute a written report under R.C. 124.341. V.Conclusion
 {¶ 46} Based on the foregoing, we find that Haddox did not meet the written report requirement contained in R.C. 124.341, and, as such, the SPRB did not err in dismissing her appeal for lack of jurisdiction, nor was it required to hold a hearing on the matter. Accordingly, we overrule Haddox's first, second, and third assignments of error, and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
BRYANT and TYACK, JJ., concur.
[1] Blosser wrote a follow-up letter to Iannotta dated November 20, 2005, purporting to clarify his previous letter dated November 3, 2005. He explained that he had Haddox deliver his letter to Iannotta because he was under the impression the November 3, 2005, meeting "was going to be friendly without confrontation with only information gathering an exploration of the facts regarding the comp time." Id. Blosser also wrote that his previous letter "was intended to be a letter of support directly to [Iannotta]," concerning "possible wrong doing from Barnes." Id. at 2.
[2] According to Barnes, he created the document for the purpose of evaluating workload/staffing needs in the workers' compensation section, and to ascertain whether an additional assistant attorney general should be requested.
[3] Blosser authored his second letter to Iannotta on November 20, 2005, one day before he was interviewed by Meyer. According to Meyer's report, Blosser "advised that his letters were meant to be in support of [Haddox] as a manager, in case a change (possible demotion or dismissal of James Barnes) was being contemplated by the AGO administration." (Meyer Memorandum May 5, 2006, at 3.) Blosser also advised that "he was not making allegations of any kind" and that "he had no first-hand knowledge of the `Comp Time' issues offered by Kelley Haddox." Id.
[4] Throughout the briefing, Haddox has maintained that she was reporting Pinkerton's alleged theft by means of false compensation time accrual. We note that such misconduct would violate DR 1-102, and, in turn, Haddox would have been charged with a mandatory duty under DR 1-103 to report Pinkerton's misconduct. It is interesting to note that the record does not indicate that Haddox reported Pinkerton's alleged misconduct, which she would have been required to do under DR 1-103. *Page 1